# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARLES R. KAELIN, M.D., <br> Plaintiff, | : <br> : <br> : | |
| v. | : <br> : | CIVIL ACTION |
| TENET EMPLOYEE BENEFIT PLAN, <br> BENEFITS ADMINISTRATION COMMITTEE <br> OF THE TENET EMPLOYEE BENEFIT PLAN, <br> RELIANCE STANDARD LIFE INSURANCE <br> COMPANY, and TENET HEALTHCARE <br> CORPORATION, <br> Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : | NO. 04-2871 |

## Memorandum and Order

YOHN, J.                                                                    December ___, 2005

   Plaintiff Charles R. Kaelin, M.D. filed this action under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, against defendants the Tenet

Employee Benefit Plan ("the Plan"), the Benefits Administration Committee of the Tenet

Employee Benefit Plan ("the Committee"), Reliance Standard Life Insurance Company

("Reliance"), and Tenet Healthcare Corporation ("Tenet").[1]  The eight-count amended complaint

contains several causes of action against these four defendants, all of which stem from a policy of

group long-term disability insurance ("the Reliance Policy") that was issued by Reliance to

Tenet, plaintiff's former employer.  The Reliance Policy was part of the Plan, which is a "welfare

plan" within the meaning of ERISA.

---

[1]Plaintiff also sued Wachovia Bank in his original complaint, but the parties later agreed
to a voluntary dismissal of the bank.

Pursuant to an agreement of the parties approved by the court, this litigation is proceeding in stages, and the first phase has been limited to the issue of plaintiff's entitlement to disability benefits under the Reliance Policy.  Plaintiff was injured in a jet ski accident on June 28, 2001, applied for disability benefits with Reliance, and was denied.

Currently pending before the court are: (1) plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c); (2) Reliance's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c); and (3) plaintiff's motion to strike or stay consideration of portions of Reliance's motion for summary judgment.

For the following reasons, both plaintiff's and defendant's motions for summary judgment will be denied without prejudice.  Additionally, plaintiff's motion to strike or stay consideration of portions of Reliance's motion for summary judgment will be dismissed as moot.

## FACTUAL BACKGROUND

### I.       The Policy

From November 28, 1995 to September 4, 2003, plaintiff, a board-certified and licensed orthopedic surgeon, practiced medicine under an employment contract with National Medical Hospital of Wilson County, Inc., d/b/a University Medical Center ("UMC"), in Lebanon, Tennessee.  (Pl.'s Stmt. of Material Facts/Def.'s Response ("Agreed Facts") ¶¶ 3-4.)  UMC was an indirect subsidiary of Tenet until November 1, 2003.  (*Id.* at ¶ 5.)  Tenet purchased the Reliance Policy (Policy No. LSC 103763), a policy of group long-term disability insurance that became effective January 1, 2000.  (*Id.* at ¶ 6; Joint Appendix 169-98.)  The Reliance Policy contained the following language:

"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

(1)     during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and

(2)     for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

     (a)     "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period.

(J.A.178.)  The Reliance Policy defined "elimination period" as ninety consecutive days of total disability during which no benefit is payable, and stated that said period started on the first day of total disability.  (J.A. 175, 177.)

The Reliance Policy was part of the Plan, which at the time relevant to this case, was a "welfare plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1),[2] and which was sponsored by Tenet.  (Agreed Facts ¶ 7.)  Plaintiff was a "participant" in the Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7),[3] as to coverage under the Reliance Policy, and he paid all of the premiums for his long-term disability coverage under the Plan with after-tax dollars through payroll deductions in the amount of $160 per bi-weekly payroll period.  (*Id.* at ¶¶ 8, 12; *see, e.g.,* J.A. 218.)  Reliance was solely responsible for adjudication and

---

[2] "Welfare plan" is defined as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . disability . . . benefits."  29 U.S.C. § 1002(1)(A).

[3] "Participant" is defined as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . or whose beneficiaries may be eligible to receive any such benefit."  29 U.S.C. § 1002(7).

payment of claims under the Reliance Policy.  (Agreed Facts ¶ 13.)

## II.    Reliance's Benefit Eligibility Determinations

On June 28, 2001, plaintiff was injured in a jet ski accident, which resulted in various injuries to his right knee and leg.  (Agreed Facts ¶ 14; J.A. 153.)  Following the accident, plaintiff stopped working full-time at UMC and did not return to work at all for approximately one month.  (Agreed Facts ¶ 17.)

Plaintiff returned to work at UMC on August 1, 2001 and worked on a reduced hours/intermittent leave basis from that date until January 21, 2002, when he ceased working to undergo reconstructive surgery on his right knee – surgery that resulted in increased knee pain. (*Id.* at ¶ 20; J.A. 266-68.)  On March 4, 2002, Kaelin again returned to work on a part-time basis, and continued through April 26, 2002, when he again stopped working due to his injuries.  (J.A. 206.)  Kaelin eventually returned to work again on August 15, 2002, before stopping again in January of 2003.  (J.A. 33, 56, 229.)

When plaintiff ceased work on April 26, 2002, he timely applied for long-term disability benefits under the Plan on Reliance's standard claim form.  (Agreed Facts ¶ 23, 25; J.A. 206-11.) Reliance received plaintiff's claim forms on May 7, 2002.  (J.A. 206.)

By letter dated June 4, 2002, Reliance acknowledged receipt of plaintiff's claim for benefits, asked plaintiff for a summary of the duties he performed when he returned to work on August 1, 2001 and March 4, 2002, and notified plaintiff that a decision would be made within thirty days.  (Agreed Facts ¶ 29; J.A. 156.)  On June 10, 2002, in response to Reliance's request for information about his job duties (J.A. 156), Kaelin submitted a letter to Reliance that explained the following:

Since the date of my accident was June 28, 2001, I have made a couple of attempts

> to return to work.  My duties were the same as always, seeing patients and
> performing surgery, however, the difference is that I have not been able to perform
> not only the number of surgeries, but I am also not able to perform any lengthy
> surgeries because of my limitation on standing.  I further require an assistant on just
> routine arthroscopies and I also require assistance in the office as well.

(J.A. 155.)

By letter dated July 25, 2002, Reliance denied plaintiff's claim for benefits, stating that

plaintiff's "original date of loss was June 29, 2001." (J.A. 152-54.)  Reliance determined that

although plaintiff may occasionally have pain, be tired, and suffer with an achy and fatigued right

leg, he "had the ability to perform a Sedentary Activity full time or a Light Duty activity part of

the time prior to the date [his] elimination period was satisfied." (J.A. 154.)  Thus, Reliance

concluded that plaintiff was "not totally disabled from performing each and every material duty

of [his] occupation during the elimination period and [did] not meet the qualifications of

disability as outlined in the policy." (J.A. 154.)  The letter stated that plaintiff could request

review of the denial of his claim in writing within sixty days of receipt of the letter, and that

"under normal circumstances," the review would be completed within sixty days of Reliance's

receipt of plaintiff's request. (J.A. 154.)  The letter further stated that "[i]f additional time is

necessary," plaintiff would be notified in writing of a final decision within 120 days of

Reliance's receipt of the request for review. (J.A. 154.)

By letter dated August 7, 2002, plaintiff requested a review of Reliance's denial of

disability benefits, stated that he "did NOT apply for full time disability until April 26, 2002,"

and notified Reliance that he "anticipate[d] going back to part-time work on Wednesday, August

14, 2002." (J.A. 149.)  Reliance responded on August 21, 2002, stating that it would "be making

*a new determination* and will send a new letter regarding your claim now that we know of the

error." ( J.A. 134 (italics added).)  The "error" was Reliance's statement in the initial claim

5

denial that plaintiff's original date of loss was June 29, 2001.

By letter dated September 20, 2002, Reliance notified plaintiff that it had completed its evaluation of his "2nd application for Long Term Disability benefits," and that he had been denied. (J.A. 112-15.) Reliance found that "[e]ven though there are some restrictions to the type and duration of surgeries you can perform, you do not meet the definition of total disability as it is written according to the [Reliance Policy]." (J.A. 114.) Reliance corrected the previous "error" and acknowledged that plaintiff "last worked on April 26, 2002 and his elimination period was over July 25, 2002." (J.A. 117.) The letter to plaintiff did state that he could request a review of this decision in writing within 180 days of his receipt of the letter. (J.A. 114.) The letter further stated that "[o]nly one review will be allowed," and that "[u]nder normal circumstances, you will be notified in writing of the final determination within 45 days of the date we receive your request for review," but that if "special circumstances" arise, plaintiff would be notified of the final decision within ninety days of the date of the request. (J.A. 114-15.)

Plaintiff timely appealed the September 20, 2002 adverse benefit determination by letter dated November 6, 2002, and Reliance acknowledged receipt of plaintiff's letter on November 11; notified him that it needed a forty-five-day extension of time to decide the claim; and by letter dated February 3, 2003, once again denied the claim, stating that it had determined that plaintiff was not totally disabled under the terms of the Reliance Policy. (Agreed Facts ¶¶ 42-43, 45, 48; J.A. 99-106, 109, 85, 5-10.) In this February 3 letter, Reliance determined that plaintiff's elimination period ran from June 28, 2001 through September 26, 2001, despite the fact that this determination was contrary to that in the September 20, 2002 denial of benefits. (Agreed Facts ¶ 49.) In this final denial of benefits, Reliance relied on medical-records reviews by William Scott

Hauptman, M.D. (who is Board Certified in Internal Medicine, Gastroenterology, and Quality Assurance and Utilization Review) and Stanley R. Askin, M.D. (a specialist in Hand and Orthopedic Surgery).  In addition to finding that Kaelin was not totally disabled during the elimination period, Reliance also determined that plaintiff had ceased to be eligible for benefits under the Reliance Policy on August 1, 2001, deeming plaintiff to have at that point ceased being a full-time employee of UMC.  (J.A. 7-9; Agreed Facts ¶ 53.)

By letter dated October 28, 2003, Reliance approved plaintiff's request to convert to individual disability coverage and notified plaintiff of the required premium.[4]  (Exh. B to Pl.'s Stmt. of Material Facts.)  Plaintiff timely paid the required annual premium on November 3, 2003, and by letter dated November 24, 2003, plaintiff was provided with a certificate of long-term disability conversion coverage (Policy No. LT10376322).  (First Am. Compl. & Def.'s Answer ¶ 122; Ex. C to Pl.'s Stmt. of Material Facts.)

## III.   Medical Evidence

Kaelin submitted numerous letters and reports from his doctors describing his medical condition, tracking his condition from the time of his injury through 2003.

As noted above, on June 28, 2001 Kaelin was injured in a jet ski accident, which accident caused him to suffer a contusion of the hip, a fibular head fracture, a lateral tibial plateau fracture, an ACL tear, a meniscal injury, and an MCL injury.  (J.A. 243.)  He was treated conservatively with immobilization.  (J.A. 243.)

---

[4] The Reliance Policy stated that "[i]f insurance ceases due to termination of employment, an Insured can use this privilege to convert to a Long Term Disability Policy currently made available by us for conversion."  (J.A. 195.)  Plaintiff applied for such a conversion after his employment with UMC terminated.

While Kaelin was able to rehabilitate his knee enough to regain a full range of motion, he still suffered from instability and decided to attempt to correct the problem with surgery.  (J.A. 268.)  Thus, on January 21, 2002, Kaelin underwent right knee reconstructive surgery.  (J.A. 266-68.)

On January 25, 2002, Oleg Urban, MOMT (Masters of Manual Therapy), PT (Physical Therapist) evaluated Kaelin.  (J.A. 243.)  Urban stated that Kaelin was doing very well, and that he showed excellent extension, good quad set in full extension, and good flexion.  (J.A. 243.)  He further reported that he expected Kaelin to continue to make good progress with his recovery, and found that Kaelin had an "excellent" prognosis.  (J.A. 243.)

On March 29, 2002, Stephen Neely, M.D., submitted a letter on behalf of Kaelin.  (J.A. 239.)  Dr. Neely, who was one of Kaelin's partners at Tennessee Sports Medicine and Orthopedics (which practice they sold to Tenet Health Systems), noted that Kaelin had for many years suffered from hip problems, and that the problems had been exacerbated by the jet ski accident.  (J.A. 239.)  Neely opined that within three years Kaelin would probably require a total hip arthroplasty.  (J.A. 239.)

On April 24, 2002, Kaelin visited Gregory White, M.D., another of his partners.  (J.A. 238.)  Dr. White noted that Kaelin would require surgical intervention for medical stabilization of his knee.  (J.A. 238.)  Dr. White also noted that Kaelin was able to stand only for short periods of time, and opined that Kaelin's limitations precluded him from continuing to work as an orthopaedic surgeon.  (J.A. 238.)

Kaelin visited Dr. White again on May 14, 2002.  (J.A. 236.)  Dr. White found that Kaelin could stand for brief periods, but not walk long distances.  (J.A. 236.)  He noted that

8

Kaelin was also suffering from low back pain.  (J.A. 236.)

Kaelin again visited the physical therapist Urban on June 3, 2002.  (J.A. 235.)  Urban explained Kaelin's rehabilitation program, which included a one-hour aquatic program and twenty to thirty minutes of bike riding at a high level of resistance.  (J.A. 235.)  Urban stated that "I feel Dr. Kaelin has made significant progress in the last two months and would expect him to continue to improve."  (J.A. 235.)

Kaelin visited Dr. White on June 26, 2002.  (J.A. 234.)  This time Dr. White noted that Kaelin was ambulating without an appliance, and that he (Dr. White) planned to look into obtaining a special brace for Kaelin's knee.  (J.A. 234.)  Additionally, Dr. White noted that he would eventually need to consider reconstruction of Kaelin's medial collateral ligament.  (J.A. 234.)

Kaelin again visited Dr. White on July 3, 2002, and Dr. White again noted that he thought the knee brace would help Kaelin.  (J.A. 233.)

On August 6, 2002, Dr. Neely wrote a letter describing Kaelin's condition.  (J.A. 270-71.)  Neely first noted that while the January surgery consisted primarily of an ACL reconstruction, it was complicated by Kaelin's other medical issues, including: other patella and fibula injuries, an old hip injury, and spondylosis of the lower three levels of his lumbar spine.  (J.A. 270.)  Dr. Neely explained that the surgery proved to be a good decision and had improved Kaelin's knee and hip functions.  (J.A. 271.)  However, Dr. Neely noted, Kaelin would probably eventually need surgery on both of his knees, his hip, and his left elbow.  (J.A. 271.)  At the same time, Dr. Neely noted that he and Dr. White would allow Kaelin to try to return to work, despite the fact that his long-term prognosis was poor.  (J.A. 271.)

Also on August 6, 2002, Dr. White composed a letter on Kaelin's behalf.  (J.A. 272-73.)
Dr. White noted that despite the January surgery, Kaelin had difficult problems yet to be
addressed that would require significant surgery.  (J.A. 272.)  Dr. White also noted that the goal
was to return Kaelin to work part-time.  (J.A. 272-73.)

On November 5, 2002, Dr. Neely composed a detailed letter regarding Kaelin.  (J.A. 222-
23.)  He opined that since April 1, 2002, Kaelin had been unable to perform the essential and
material duties of an orthopaedic surgeon.  (J.A. 222.)  Dr. Neely explained that the essential
duty of an orthopaedic surgeon is to perform surgery, and that all other duties are minuscule in
comparison.  (J.A. 223.)  He provided a list of Kaelin's limitations, which included, *inter alia*, an
inability to: 1) operate the foot controls necessary for most orthopaedic surgery procedures; 2)
perform most of the shoulder procedures Kaelin used to perform; 3) serve on emergency room
and orthopaedic call rotation; 4) tie his surgical mask; 5) button the top button of his shirt; and 6)
wash the lower part of his right leg without assistance.  (J.A. 222-23.)

On January 1, 2003, Kaelin again met with Dr. White.  (J.A. 225.)  During this meeting,
Kaelin explained that while performing surgery the previous week, he had experienced swelling
in his right leg and a seepage of clear fluid from his leg.  (J.A. 225.)  Dr. White recommended
that Kaelin cease standing at work, both in the operating room and while seeing patients.  (J.A.
225.)  Dr. White also recommended against Kaelin seeing post-operative patients while suffering
from such seepages, because the seepages increased the risk of the transmission of an infection.
(J.A. 225.)

On January 20, 2003, Lawrence Lemak, M.D., wrote a letter on Kaelin's behalf.  (J.A. 28-
29.)  Dr. Lemak first explained that Kaelin's condition was getting worse.  (J.A. 28.)  Dr. Lemak

opined that Kaelin was unable to continue to work as an orthopaedic surgeon, because he was no longer able to perform the strenuous surgical duties due to a lack of both strength and stamina. (J.A. 29.)

Finally, Stanley Askin, M.D., considered and opined on Kaelin's medical records. (J.A. 11-12.) Dr. Askin identified several orthopaedic concerns that existed before the jet ski accident, including: a right slipped capital femoral epiphysis with secondary changes sufficient to warrant recommendation for total hip replacement, old left elbow pathology, and evidence of old right knee osteoarthritis. (J.A. 11.) Additionally, Dr. Askin explained that the new injury caused a proximal fibula fracture and a soft tissue injury of the right knee/calf area including knee ligamentous injury. (J.A. 11.) Dr. Askin explained that "assuming that Dr. Kaelin had been able to function as an orthopaedic surgeon before the jet-ski injury, the only changed circumstance for his ability to function professionally would be that imposed by his right leg." (J.A. 12.) Based on these findings, Dr. Askin concluded that only sedentary employment would be appropriate for Kaelin. (J.A. 12.) Dr. Askin opined that Kaelin would lack the strength to perform surgeries full-time and that as long as Kaelin was suffering from seepages, he should not perform surgery at all. (J.A. 12.) However, Dr. Askin explained that a "physically impaired orthopaedic surgeon is not without some usefulness to include doing office hours, and administrative activities." (J.A. 12.)

## PROCEDURAL BACKGROUND

Plaintiff initially filed a *pro se* complaint on June 25, 2004 against the Plan; the Committee; Reliance; Tenet; and Wachovia Bank of North Carolina ("Wachovia"), which plaintiff asserted was the trustee of the Plan. Several motions to dismiss were filed in response,

the parties stipulated to the dismissal of Wachovia as a defendant, and plaintiff retained counsel and filed a first amended complaint on February 24, 2005.  A scheduling conference was then held, and the court approved the agreement of the parties that discovery proceed and motions be filed only on the benefits claim against Reliance.  Discovery on that issue has been conducted, and plaintiff and Reliance have both moved for summary judgment.  In addition, plaintiff has filed a motion to strike or stay consideration of portions of Reliance's motion for summary judgment, arguing that Reliance has contravened the court's order and has addressed issues outside simply the benefits claim.  All subsequent responses and replies have been filed.

## SUMMARY JUDGMENT STANDARD

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).  The non-movant must present concrete evidence supporting each essential element of its claim.  *Celotex*, 477 U.S. at 322-23.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Furthermore, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id*.

"Summary judgment may not be granted . . . if there is a disagreement over what inferences can

be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d

at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does

not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson*

*v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more

than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden

of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587 (citations omitted).

## DISCUSSION

The motions for summary judgment filed by plaintiff and Reliance primarily address the

same issues: (1) the standard of review to be applied to Reliance's denial of benefits to plaintiff;

and (2) whether plaintiff was entitled to benefits under the terms of the Reliance Policy.

However, Reliance's motion also seeks judgment on plaintiff's claims of breach of fiduciary

duty, unjust enrichment, and estoppel. Thus, plaintiff has filed a motion to strike or stay

consideration of these issues, on the ground that their inclusion in Reliance's motion contravenes

the parties' agreement and the court's order that motions be filed only on the benefits claim

against Reliance. The court will deal with the summary judgment motions first, and then proceed

to plaintiff's motion to strike or stay consideration.

## I.      ERISA Standard of Review to be Applied to Reliance's Decision to Deny Benefits

### A.      *Pinto*'s Heightened Arbitrary and Capricious Standard

The Supreme Court has explained that a decision to deny benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the administrator is given such discretion, the court generally should apply the "arbitrary and capricious" standard.  In the Third Circuit, this means that a court should overturn the decision of a plan administrator "only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (citations omitted).

There is no dispute that the benefit plans at issue grant Reliance discretionary authority to determine eligibility for benefits and construe the terms of the Reliance Policy.[5]  (Pl.'s Summ. J. Mem. 4; Def.'s Resp. 3.)  Hence, it seems proper to apply the "arbitrary and capricious" standard. However, the Supreme Court has made clear that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Bruch*, 489 U.S. at

---

[5] The Reliance Policy states:

> Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits.  Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

(J.A. 182.)

115 (citation omitted).  The Third Circuit has held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review."  *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000).

In the present case, Reliance both funds and administers benefits under the Reliance Policy.  Accordingly, the "heightened form" of the arbitrary and capricious standard of review, as described in *Pinto*, applies to this case.[6]

This "heightened form" requires courts "to consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers."  *Pinto*, 214 F.3d at 393.  More specifically, the court in *Pinto* established "a sliding scale method, intensifying the degree of scrutiny to match the degree of the conflict," so that the arbitrary and capricious standard is "more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is."  *Id.* at 379, 392-93 (citations omitted).

*Pinto* offered a nonexclusive list of factors for courts to consider in assessing the nature and degree of the structural conflict of interest.  *Id.* at 392.  These factors include: (1) the

_____

[6] Kaelin argues that the *de novo* standard of review should be applicable because Reliance allegedly violated several of ERISA's procedural requirements in reviewing his claim.  However, the Third Circuit case law that he cites to support this argument is inapposite.  He cites *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002), in which the court held that the denial of benefits under a plan that was governed by ERISA was subject to *de novo* review because the administrator "never made any effort to analyze appellants' claims much less to advise them of what that analysis disclosed until after this litigation was filed."  Because of this, *Gritzer* found, the administrator effectively did not use discretion, which rendered arbitrary and capricious review inappropriate.  *Id.*  Here, Reliance did exercise discretion in rejecting Kaelin's claim and provided Kaelin with detailed reasons for its decision.

sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the administrator, since the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction. *Pinto*, 214 F.3d at 392.

In addition to the four factors discussed above, the *Pinto* court stated that courts should "look not only at the result – whether it is supported by reason – but at the process by which the result was achieved." *Id.* at 393; *see also Kosiba*, 384 F.3d at 66 ("Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits."). The "procedural anomalies" in *Pinto* were: "(1) the insurer's reversal of its original determination without the examination of additional evidence; (2) a self-serving selectivity in the use of evidence; and (3) a bias in decision-making to the benefit of the insurer." *Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp. 2d 392, 406 (D. Del. 2001) (interpreting and citing *Pinto*).

Courts applying the heightened standard have been on the "mild end" of the sliding scale when they find "no evidence of conflict other than the inherent structural conflict," *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385 (3d Cir. 2003),[7] and have been on the "far end of the arbitrary and capricious 'range'" when they find "procedural anomalies," *Pinto*, 214 F.3d at 394; *see also Weinberger v. Reliance Standard Life Ins. Co.*, 54 Fed. Appx. 553 (3d Cir. 2002) (finding the district court's application of "moderate deference" to be in error given the troubling aspects of Reliance's decision-making procedure); *Lemaire v. Hartford Life & Accident*

---

[7] *See also Cimino v. Reliance Standard Life Ins. Co.*, 2001 WL 253791 (E.D. Pa. Mar. 12, 2001).

*Ins. Co.*, 69 Fed. Appx. 88 (3d Cir. 2003).

Kaelin asserts that the far end of the arbitrary and capricious standard should apply to this case.  He argues both that Reliance suffered from a conflict of interest in determining his eligibility for benefits and that the Reliance's review of his claim was marred by numerous procedural anomalies.

### B.    Factors Demonstrating a Structural Conflict of Interest

To reiterate, *Pinto* found that in determining the severity of a structural conflict of interest, courts should consider "the sophistication of the parties, the information accessible to the parties, . . . the exact financial arrangement between the insurer and the company . . . [and] the current status of the fiduciary."  *Pinto*, 214 F.3d at 392.  These factors will be discussed in turn.

With reference to the issue of the sophistication of the parties, in *Rosen v. Provident Life & Accident Insurance Co.*, 2003 WL 22254805, at *7 (E.D. Pa. Sept. 30, 2003), the court concluded that the plaintiff was not sophisticated for the purposes of its analysis, despite her holding an advanced college degree, because "there [was] no evidence that she was sophisticated in terms of ERISA."  Similarly, in *Cohen v. Standard Insurance Co.*, 155 F. Supp. 2d 346, 353 (E.D. Pa. 2001), the court held that an attorney was not sophisticated for the purposes of its analysis because "he [was] a labor attorney and there [was] no evidence that he [was] sophisticated in insurance or medical matters," and despite the fact that he was represented by counsel when he appealed the denial of his claim to the defendant insurance company.  In the present case, despite the fact that plaintiff is an orthopedic surgeon and thus has experience with medical matters, there is no evidence that he is sophisticated in terms of insurance or ERISA

issues.  In addition, his representation by counsel on appeal of Reliance's denial of his claim for

benefits does not place him "on equal footing with Reliance."  (Def.'s Resp. to Pl.'s Summ. J.

Motion 7.)  This factor supports increasing the degree of scrutiny.

In addition, with reference to the information accessible to the parties, it is true that the

reports of Drs. Askin and Hauptman – which were relied upon in the February 3, 2003 Reliance

letter to plaintiff – were authored less than two weeks before the final denial of benefits, and

there is no evidence that plaintiff was able to review these documents.  (*See* J.A. 11-12, 33.)

Thus, this factor also supports a slight increase in the degree of scrutiny that the court will apply.

However, with regard to the "financial arrangement between the insurer and the

company," the court agrees with Reliance that plaintiff applies an incorrect analysis by focusing

on UMC and not on Tenet, because the Tenet/UMC relationship did not end until November 1,

2003 – after Reliance's final denial of plaintiff's claim for benefits.  (Agreed Facts ¶¶ 4-5.)

Thus, the court finds misplaced plaintiff's argument that "neither Tenet nor Reliance had any

incentive or reputational interest to maintain employee satisfaction at UMC."  (Pl.'s Summ. J.

Mem. 11.)  Similarly misplaced is plaintiff's argument that "there was no long term relationship

between . . . Tenet, UMC, and Reliance."  (*Id.*)  The evidence shows that the Tenet/Reliance

relationship had been ongoing for almost four years before plaintiff's claim for benefits was

denied, and the Tenet/UMC relationship had been continual for at least that long.  Thus, this

factor will not serve to increase the level of scrutiny with which I will examine Reliance's

determination.

As for the final *Pinto* factor, the court notes that plaintiff makes no argument regarding

Reliance's current status.  In addition, the court notes that Reliance remains a viable company,

18

and the evidentiary record is silent as to whether Reliance is "breaking up, or laying off a significant percentage of [its] employees, or moving all [its] operations," which would perhaps diminish its incentive to maintain employee satisfaction. *See Pinto*, 214 F.3d at 392. This factor will not affect the standard of review for *Pinto* purposes.

    **C.**    **Procedural Anomalies**

    In addition to presenting arguments about the *Pinto* factors, Kaelin asserts that "[t]his case is rife with procedural anomalies." (Pl.'s Summ. J. Mem. 11.) First, plaintiff contends that Reliance failed to comply with ERISA in that: (1) Reliance required plaintiff to suffer two levels of administrative appeal even though the Reliance Policy did not allow or require such; (2) Reliance's first and third denial letters were untimely; and (3) said decisions did not satisfy regulatory content requirements. (*Id.* at 5-9.) Second, plaintiff identifies seven other actions of Reliance that he claims qualify as procedural anomalies. These arguments will be discussed in turn.

    **1.**    **Alleged ERISA Violations**

    With reference to plaintiff's assertion regarding the two levels of appeal, the evidence only supports the filing of one appeal. As Reliance points out, plaintiff's "first appeal" was actually a new determination of his disability claim, due to Reliance's error in initially determining plaintiff's original date of loss. Thus, only plaintiff's "second appeal" qualified as an appeal under the applicable regulations.

    In addition, plaintiff is incorrect in his assertion that Reliance's decisions were untimely. Under the applicable regulations, an ERISA fiduciary has forty-five days from the date of receipt of the disability benefits claim to make an initial decision. 29 C.F.R. § 2560.503-1(f)(3). This

forty-five-day period can be extended, however, but only if the fiduciary "determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant prior to the expiration of the initial" period. *Id.* In addition, if the initial period is extended because the fiduciary requires additional information from the claimant, "the period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information." 29 C.F.R. § 2560.503-1(f)(4). Here, Reliance received plaintiff's application for benefits on May 7, 2002. (J.A. 206.) Thus, Reliance had forty-five days in which to respond with a determination – or until June 21, 2002. Reliance acknowledged receipt of plaintiff's claim on June 4, 2002, requested that plaintiff submit a summary of the duties he performed when he returned to work after being injured, and notified plaintiff that a decision would be made within thirty days. (J.A. 156.) The determination period was then tolled from June 4 until June 10, when plaintiff responded with the requested information, and so the end of the initial forty-five day period was pushed back to June 27, 2002. In addition, the June 4, 2002 letter essentially requested the thirty-day extension of time authorized by 29 C.F.R. § 2560.503-1(f)(3), and thus Reliance had until July 27, 2002 in which to make a decision on plaintiff's claim. Reliance's July 25, 2002 determination was therefore timely.

Reliance's third denial letter also was timely. Once a claimant appeals an adverse benefits determination, the fiduciary then has forty-five days in which to render a decision, in writing. 29 C.F.R. § 2560.503-1(I)(1)&(3). A fiduciary can obtain an extension of an additional forty-five days if it notifies the claimant in advance, in writing, of the reasons for the extension. *Id.* Plaintiff appealed Reliance's new determination of plaintiff's claims by letter dated

November 6, 2002.  (J.A. 99.)  Thus, Reliance had until December 21, 2002 to make a decision

on the appeal.  However, on December 13, 2002, within the initial forty-five-day period, Reliance

notified plaintiff that it would be taking the additional forty-five days to make the decision,

which extended its deadline to February 4, 2003.  (J.A. 85.)  Thus, its final decision on February

3, 2003 was timely.  (J.A. 5-10.)

Plaintiff also contends that Reliance's denial letters violated the content requirements of

ERISA's claims procedure regulations.  (Pl.'s Summ. J. Mem. 7-9.)  The court will deal with

each letter in turn.  Plaintiff asserts that the initial denial letter, dated July 25, 2002, was

insufficient because: (1) it did not contain a complete notice of the appeal procedures; (2) it did

not describe plaintiff's right to receive copies of relevant documents; (3) it provided that a

decision on review would be made within 120 days, instead of the ninety required by the ERISA

regulations; and (4) it did not identify the medical or vocational experts whose advice was

obtained by Reliance in connection with the denial.  (*Id.* at 7-8.)  The problem with assertions

(2), (3), and (4) is that the applicable regulations require only that "the claims procedures"

provide a claimant with reasonable access to documents relevant to the claim, with a prompt

review, and with the identities of any experts consulted in connection with the determination.  29

C.F.R. § 2560.503-1(h)(2)(iii), (f)(1)&(3), (h)(3)(iv).  These regulations do not state that denial

letters must contain notice of these requirements.  In addition, there is no evidence that plaintiff

was specifically denied access to any requested documents, the court has already determined that

Reliance's responses to plaintiff's claims were timely, and there is no evidence that Reliance kept

from plaintiff the identities of its consultative experts.  In addition, assertion (1) is meritless, as

Reliance did set forth in the notification of the benefit determination a "description of the plan's

review procedures and the time limits applicable to such procedures," 29 C.F.R. § 2560.503-

1(g)(1)(iv).  (J.A. 154.)  Thus, there is no evidence of procedural anomalies in connection with

Reliance's first denial letter.

Plaintiff contends that the second denial letter, dated September 20, 2002, violated the

applicable regulations because it: (1) was written by the same person who authored the initial

denial letter; (2) did not identify Reliance's consultative experts; and (3) required plaintiff to

endure a second level of appeal.  (Pl.'s Summ. J. Mem. 8.)  With reference to (2), again, the

regulations do not require that claim denial letters contain notice of procedural requirements, and

there is no evidence that plaintiff was deprived of the identities of Reliance's experts.  With

reference to (3), the court has already determined that plaintiff actually endured only one appeal,

as the "first appeal" was a new determination of plaintiff's claim.  As for (1), the regulation

plaintiff references is applicable only to appeals of initial denials.  29 C.F.R. §

2560.503(h)(3)(ii).  Thus, because the September 20, 2002 denial was not an appeal, but was

instead a new determination of plaintiff's claim, it was not necessary to have as the claim

reviewer someone "who is neither the individual who made the adverse benefit determination

that is the subject of the appeal, nor the subordinate of such individual."  *Id.*  Therefore, the court

finds no procedural anomalies in connection with Reliance's second denial letter.

Plaintiff asserts that the third denial of benefits, dated February 3, 2003, violated the

content requirements of the regulations because it: (1) did not indicate whether the decision on

review gave deference to the prior denials; (2) did not indicate whether the author was or was not

a subordinate of the person who made the prior decisions to deny benefits; and (3) did not

contain a complete notice of plaintiff's right to a voluntary appeal or arbitration, or his right to

file a civil action in court.  (Pl.'s Summ. J. Mem. 8.)  With regard to (1) and (2), the court finds

that plaintiff must not have read the February 3 denial letter, because it states clearly that an

"independent review" was done, and that "[t]his review has been conducted separately from the

individual(s) who made the original determination to deny" benefits to plaintiff.  (J.A. 5.)

Reliance did conform to the regulations' requirement that:

> the claims procedures . . . [p]rovide for a review that does not afford deference to the
> initial adverse benefit determination and that is conducted by an appropriate named
> fiduciary of the plan who is neither the individual who made the adverse benefit
> determination that is the subject of the appeal, nor the subordinate of such individual.

29 C.F.R. § 2560.503-1(h)(3)(ii).  Thus, the court finds no procedural anomalies with regard to

assertions (1) and (2) in connection with the third denial letter.  However, with reference to (3),

the court finds that Reliance did fail to set forth in the notification of the benefit determination a

"description of the plan's review procedures and the time limits applicable to such procedures,

including a statement of the right to bring a civil action . . . following an adverse benefit

determination on review."  29 C.F.R. § 2560.503-1(g)(1)(iv).  This represents a slight procedural

anomaly.

### 2.    Other Alleged Procedural Anomalies

In addition to the assertion that Reliance's denial letters violated the content requirements

of ERISA's claims procedure regulations, plaintiff puts forth seven other actions by Reliance that

plaintiff claims qualify as procedural anomalies warranting a heightened arbitrary and capricious

standard of review.  Not surprisingly, Reliance disputes each and every one of these claimed

anomalies and argues that "there is no substance to them."  (Def.'s Resp. to Pl.'s Summ. J. Mem.

8.)  The court will deal with each allegation in turn.

First, plaintiff asserts that Reliance based its first and second denials, in part, on the definition of surgeon provided by the United States Department of Labor's Dictionary of Occupational Titles ("DOT"), which reliance was contrary to the Third Circuit's decision in *Lasser v. Reliance Standard Life Insurance Co.,* 344 F.3d 381 (3d Cir. 2003).  In *Lasser*, the court explained that because the DOT does not include a separate listing for "orthopaedic surgeon," it is "unhelpful and thus, to the extent that Reliance's conclusion is based on the DOT's definition of surgeon, that conclusion is unreasonable."  344 F.3d at 388 n.5.  Here, Reliance did base its first and second (but not third) denials, at least in part, on the DOT's definition of "surgeon."  (J.A. 153, 113-14.)  Thus, the court will consider Reliance's use of the DOT to be a slight procedural anomaly for ERISA standard of review purposes.

Second, plaintiff contends that "Reliance engaged a gastroenterologist and other non-orthopedic healthcare consultants to review [the] medical records," despite the fact that plaintiff's "injuries were clearly bone- and surgery-related."  (Pl.'s Summ. J. Mem. 12.)  However, as Reliance points out, Dr. Hauptman (the gastroenterologist to whom plaintiff refers) is also Board Certified in Internal Medicine and Quality Assurance and Utilization Review, and was consulted primarily regarding plaintiff's work schedule.  (J.A. 33.)  In addition, the other healthcare consultants to whom plaintiff refers were consulted for a complete medical evaluation of the claim.  (J.A. 113.)  Nothing precludes Reliance from obtaining a full medical analysis of a claim.

Third, plaintiff claims that Reliance discounted or ignored the opinions of plaintiff's treating physicians.  However, a look at the denial letters shows that Reliance did consult and consider the reports of Drs. Lemak, White, and Neely.  (J.A. 113, 7.)  In addition, the United

24

States Supreme Court has stated that ERISA "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

Fourth, plaintiff claims that Reliance changed its determination of the start of plaintiff's elimination period, and that this change "demonstrates a bias in decision-making to the benefit of the insurer." (Pl.'s Summ. J. Mem. 12.)  In its initial determination, Reliance considered the severity of Kaelin's injuries for the ninety-day periods beginning on June 29, 2001, August 1, 2001, and January 21, 2002.  (J.A. 153.)  Kaelin then wrote to Reliance, explaining that he had been out of work since April 27, 2002, and that that date should mark the start of his elimination period.  (J.A. 149.)  Reliance then issued a new decision, dated September 20, 2002, which accepted Kaelin's assertion of an April 27, 2002- July 25, 2002 elimination period but found that he was not totally disabled during that period.  (J.A. 113.)  However, in its February 3, 2003 review of its September 20 decision, Reliance utilized an elimination period beginning on June 28, 2001, rather than April 27, 2002.  The February 3 decision did not explain Reliance's rationale for choosing an elimination period beginning on June 28, 2001 rather than April 27, 2002,[8] so it is impossible to ascertain whether it was a reasoned determination or an oversight. Thus, Kaelin's disability status from the period of April 27, 2002 to June 25, 2002, which is the period for which he claimed disability (J.A. 149), has never been considered on administrative

---

[8] Reliance did tack, to the end of its three-page analysis discussing Kaelin's condition during the period beginning June 28, 2001, a simple sentence stating "when Dr. Kaelin ceased working on 4/26/02, he was no longer eligible for the LTD coverage."  However, this is not a meaningful explanation of Reliance's decision to evaluate Kaelin's condition during a completely different time period than the one used in the previous decision that Reliance was ostensibly reviewing.

25

appeal.  I find that Reliance's use of different elimination periods in different decisions, without meaningful explanation of the changes, represents a very significant procedural anomaly for purposes of *Pinto*'s sliding scale.

Fifth, plaintiff asserts that Reliance considered the fact that plaintiff returned to work in denying his claim, even though he returned to work out of economic necessity and a moral and legal duty to his patients.  (Pl.'s Summ. J. Mem. 13.)  However, there is no evidence that plaintiff asserted his economic necessity position during the claims process, and thus Reliance could not have ignored it.  In addition, even if plaintiff did return to work out of a moral or legal duty to his patients, Reliance would still be justified in taking into account his ability to perform his job in determining whether plaintiff was disabled.

Six, plaintiff asserts also that Reliance referred to its second denial letter as a "generic letter," representing a predisposition to deny claims without considering their respective merits.  (Pl.'s Summ. J. Mem. 13.)  The "generic letter" language to which plaintiff refers is contained in a record of a phone conversation between Ms. Carol Timlin, a Senior Claims Examiner at Reliance, and Mr. Robert Cox, a Human Resource Manager at Tenet.  (J.A. 120.)  Timlin stated that she would send a "generic letter" *to Tenet* stating that Reliance had denied plaintiff's claim. *Id.*  This letter to Tenet states that a "detailed letter has been sent to Dr. Kaelin with the instructions to file an appeal if he chooses to do so."  (J.A. 117.)  Thus, the "generic" language refers to the letter to Tenet, not to the actual denial letter sent to plaintiff.  In addition, the court finds that it would be too great an inferential leap to conclude that the "generic" language evidences a predisposition to deny claims.  It would not be unusual for an insurance company to have a "generic" form letter it sends to employers of claimants to notify them of claim denials.

Finally, plaintiff contends that Reliance ignored Timlin's recommendations to obtain an

independent medical examination of plaintiff, and that "[t]his further supports the view that whenever it was at a crossroads, Reliance chose the decision disfavorable to [p]laintiff." (Pl.'s Summ. J. Mem. 13.) However, while Reliance did not obtain an independent medical examination of plaintiff, it did obtain an independent medical review – said review having been performed by Dr. Askin on January 26, 2003. ( J.A. 11-12.) While this is a slightly different course than the one recommended by Timlin, it appears to be a reasonable decision by Reliance that does not constitute an anomaly in its process.

### D.     Standard of Review

Thus, I find that there was an inherent conflict caused by Reliance's role in both funding and administering benefits, plaintiff was relatively unsophisticated, and that there was a slight inaccessibility to the documents. I also find that there were procedural anomalies in Reliance's use of different elimination periods in its different decisions, its reliance on the DOT definition of "surgeon" in its first two decisions, and its failure to comply with 29 C.F.R. § 2560.503-1(g)(1)(iv)'s notice requirements in its third letter. Because these factors show both a structural conflict of interest and procedural irregularity, I will utilize a significantly heightened arbitrary and capricious standard of review. *See Kosiba*, 384 F.3d at 68 (noting that "a significantly heightened arbitrary and capricious standard of review would be warranted" if the record showed procedural anomalies and that the administrator acted under a financial conflict of interest). Thus, while "a court may not substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard," *Stratton v. E.I. Dupont De Nemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004) (quoting *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.*, 298 F.3d 191, 199 (3d Cir. 2002)), I will "examine the facts before the

administrator with a high degree of skepticism." *Pinto*, 214 F.3d at 394.

## II.     Plaintiff's Entitlement to Benefits

The primary issue before the court is whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that plaintiff was not "totally disabled" within the meaning of the Reliance Policy.  In this analysis, the court may review only the evidence that was before Reliance at the time the determination was made.  *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997).  The competing motions for summary judgment primarily address the following issues with reference to the "total disability" determination: (1) whether Reliance correctly determined plaintiff's elimination period; (2) whether Reliance reasonably interpreted the definition of "total disability" in the Reliance Policy; (3) whether plaintiff provided ample proof of his disability; and (4) whether plaintiff was entitled to coverage under the Reliance Policy in the first place.  The court will deal with each of these issues in the order in which they have been introduced.

### A.     Plaintiff's Elimination Period

As stated above, the Reliance Policy defines the elimination period as ninety consecutive days of total disability during which no benefit is payable.  (J.A. 175.)  In addition, the Reliance Policy states that the elimination period starts on the first day of total disability.  (J.A. 177.)  The elimination period is basically the period that a claimant must satisfy prior to commencement of benefits under the Reliance Policy.  Reliance contends that plaintiff's elimination period began on June 28, 2001, the date of plaintiff's jet ski accident and the date that plaintiff himself included in his application for benefits as the "Date you were first unable to work on a full time basis."  (Def.'s Resp. to Pl.'s Summ. J. Mem. 12; J.A. 206.)  Plaintiff asserts that the elimination

period did not begin until April 27, 2002, arguing that this was the date on which he filed his claim for benefits, "stating that he was then totally disabled." (Pl.'s Summ. J. Mem. 23.) Plaintiff points out that he "did not seek benefits on account of any periods prior to April 26, 2002." (*Id.*)

The court agrees with plaintiff that the elimination period did not begin until April 27, 2002, shortly after plaintiff was informed by his personal physician that plaintiff could no longer perform the duties of an orthopedic surgeon, due to his unsuccessful reconstructive knee surgery, his continued knee and back pain, his wound from his jet ski accident, nerve damage, and his inability to stand for prolonged periods. (J.A. 15-16.) Before that date, plaintiff had returned to work twice, albeit on a reduced-hours basis, and his "duties were the same as always," except that he was "not able to perform any lengthy surgeries because of my limitation on standing." (J.A. 155.) Thus, plaintiff's first day of total disability was in April of 2002 and not in June of 2001, despite the fact that the injury that eventually caused the disability happened in June. In addition, plaintiff's inclusion of June 28, 2001 on his benefit application form as the "Date you were first unable to work on a full time basis" is not dispositive of this issue, mainly because inability to work full-time does not mean total disability as it does not preclude the ability to work part-time or speak to the issue of whether he was unable to work full-time for a period of ninety days. (J.A. 149.) Additionally, plaintiff corrected Reliance regarding the start of the elimination period in his response to Reliance's first denial letter. (J.A. 149.) In fact, as plaintiff points out, Reliance agreed with plaintiff on several occasions that the elimination period began on April 27, 2002. (Pl.'s Summ. J. Mem. 22; J.A. 113, 117, 136, 201, 226-227, 231, 269.) In light of the foregoing, the court determines that plaintiff's elimination period under the Reliance

Policy began on April 27, 2002, and ran for ninety days until July 25, 2002.  The conclusion of

Reliance to the contrary was arbitrary and capricious under the heightened standard.

**B.      Interpretation of Policy Language**

As has been stated previously, under the Reliance Policy, "totally disabled" means "that

as a result of an Injury or Sickness, during the Elimination Period, an Insured cannot perform

each and every material duty of his/her regular occupation."  (J.A. 178.)

However, the policy fails to define several of the terms included in that statement.  The

parties dispute what, if any, duties Kaelin was able to perform during the elimination period, and

whether those duties constitute "material duties of his regular occupation."  Thus, the

determination of the specific meanings of "each and every," "regular occupation," and "material

duty" will be central to the resolution of Kaelin's claim.

**1.      "Each and Every"**

Reliance contends that the phrase "each and every" means that "if plaintiff was able to

perform even one of the material duties of his occupation even on a part-time basis, he was not

totally disabled."  (Def.'s Summ. J. Mem. 8.)  Thus, because Reliance determined that plaintiff

"demonstrated his ability to perform some of the material duties of his occupation" (i.e.,

performing surgeries with assistance and consulting with patients in his office) after June 28,

2001, Reliance denied the claim.  (J.A. 9-10.)  Plaintiff contends that Reliance's "interpretation is

wrong and unreasonable."  (Pl.'s Resp. to Def.'s Summ. J. Mem. 15.)

In *Thompson-Harmina v. Reliance Standard Life Ins. Co.*, the late Judge Newcomer

interpreted the "each and every" language in the way Reliance does in the present case, stating

that "[u]nder this Policy, if she can perform even one of her material duties, then Plaintiff is not

Totally Disabled under the Policy." 2004 WL 2700342, at *5 (E.D. Pa. Nov. 23, 2004).

Additionally, both the Sixth and Fourth Circuits have defined the phrase in this way. *See Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 607 (6th Cir. 2004) (interpreting the each and every language to mean that "[i]f a claimant can perform even one material duty of his regular occupation during the Elimination Period, he is not totally disabled); *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 275 (4th Cir. 2002) (same). I conclude that Judge Newcomer's interpretation of that phrase is the correct one, because the court reads "each and every" in its normal, everyday usage. An ability to perform even one material duty, then, renders a claimant not totally disabled.

### 2. "Regular Occupation"

The Third Circuit was faced with a dispute about the material duties of an individual's regular occupation in *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381 (3d Cir. 2003). In *Lasser*, an orthopaedic surgeon brought an action under ERISA challenging Reliance's decision to deny him benefits. *Id.* at 383. The insured had suffered a heart attack, which he alleged precluded him from handling night call and emergency surgeries. *Id.* The policy in *Lasser* was such that the insured would be disabled if he were "capable only 'of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.'" *Id.* at 385. Thus, the Third Circuit was called to determine whether handling night call and performing emergency surgeries were material duties of the insured's regular occupation. In concluding that they were, the court explained that "'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability." *Id.* at 386. Thus, it is the specific job duties of the individual that are important,

31

rather than a general job title.

Accordingly, Kaelin's regular occupation was the work that he completed in his employment for UMC before April 27, 2002.

### 3.    "Material Duties"

After determining that Kaelin's regular occupation was his work for UMC, it is necessary to determine which of his duties were "material."  The inclusion of the word "material" seems to signify that not every duty that an employee performs is relevant to this inquiry; that is, the requirement would be different if the policy referred to an individual who "cannot perform each and every duty of his/her regular occupation."  On the other hand, the duties relevant to this case need not be as important and time-consuming as those described by policies that refer to *substantial and* material duties.  *See Cimino v. Reliance Standard Life Ins. Co.*, 2001 WL 253791 (E.D. Pa. Mar 12, 2001); *Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399, 402 n.5 (7th Cir. 1999) (explaining that the policy at issue defined substantial and material duties as "those duties which account for 50% or more of your prior average earned income from your regular occupation").  Thus, it would seem that the duties relevant to determining disability under this policy fall somewhere between the two counterexamples described above.

A district court has determined that "'[a] duty is 'material' when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation.'"  *Byrd v. Reliance Standard Life Ins. Co.*, 2004 WL 2823228, at *3 (E.D. Pa. Dec. 7, 2004) (quoting *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp.2d 619, 636 (D.N.J. 2001)).

In concluding that handling night call and performing emergency surgeries were material

duties of the insured, the Third Circuit in *Lasser* utilized a common-sense approach (without referring to the district court's formulation quoted above), essentially just elaborating upon its definition of regular occupation.  It considered, simply, "what [the insured] did in the course of his regular occupation."[9]  *Id.* at 387.

Thus, in order to identify Kaelin's material duties, it is necessary to determine what work he completed at his position before his alleged disability, and then measure the significance of that work.  In his application, he listed surgery as his only duty.  (J.A. 210.)  However, in response to Reliance's letter that asked for an explanation of the duties that he performed at work (J.A. 156), he stated that his duties included "seeing patients and performing surgery" (J.A. 155).  Additionally, Kaelin's employer, in reference to a question about which of Kaelin's duties required the use of both of his hands, stated that surgery and casting were both "major tasks." (J.A. 204.)

Accordingly, while there appears to be no dispute that surgery was one of the material duties of Kaelin's occupation, the parties contest whether seeing patients/performing office work (and, perhaps, casting) was a sufficiently significant responsibility to also qualify as a material duty.  Or, as the district court described the issue, whether Kaelin would no longer have been practicing his job if he were unable to see patients.  *See Byrd*, 2004 WL 2823228, at *3.  There is evidence in the record that shows that Kaelin spent a substantial amount of time seeing patients.  Before his January 2002 surgery, he usually saw over 100 patients a month, and he continued to

---

[9] The court noted that the insured "saw patients during office hours, performed scheduled surgeries, took night call, and performed emergency surgeries."  *Lasser*, 344 F.3d at 387.  However, since *Lasser* found that regular occupation and material duties would be personal to each insured, that determination of duties is not controlling in this case.

see patients after that surgery.  (J.A. 56.)  Additionally, as noted above, in his June 10, 2002

letter, Kaelin himself intimated that seeing patients was one of his duties.  (J.A. 155.)

On the other hand, Kaelin and his doctors argue that only one duty, performing surgery, is

relevant to his purported disability.  They argue that surgery is the *sine qua non* of an orthopaedic

surgeon, and that an individual who cannot perform surgery can no longer work as an

orthopaedic surgeon.  This point is disputed by Dr. Askin, who stated that a "physically impaired

orthopaedic surgeon is not without some usefulness," because he could aid in "doing office hours

and administrative activities."  (J.A. 12.)

Reliance's February 3, 2003 decision contains only a cursory discussion of the materiality

of Kaelin's different duties.  The decision reasoned that because Kaelin's June 10, 2002 letter

stated that in August of 2001 he was able to perform some surgeries and consult with patients, he

was not disabled under the policy.  (J.A. 9.)  However, the decision did not separate seeing

patients from performing surgeries and determine whether seeing patients only was an

independent material duty.  Because Reliance did not address this issue in its February 3, 2003

decision and the record as presently developed does not allow for a clear resolution of this issue,

I will deny both motions for summary judgment on this issue.

### C.    Duties that Kaelin Could Perform During his Elimination Period

Reliance's final denial of plaintiff's claim for disability benefits was based on its

determination that the elimination period began on June 28, 2001, a determination that the court

has found to be arbitrary and capricious.  Thus, the question is whether plaintiff was totally

disabled from April 27, 2002 to July 25, 2002.  Reliance's final denial of benefits, dated February

3, 2003, relied heavily on the reviews of plaintiff's file performed by Drs. Hauptman and Askin.

34

(J.A. 8-9.)  These reviews concluded that plaintiff returned to work during what Reliance determined to be the elimination period, and that plaintiff "consistently demonstrated his usefulness by consulting with patients and performing surgeries, on a part-time basis."  (J.A. 9.)  In addition, Reliance's final denial highlighted the fact that plaintiff himself stated when he returned to work, his "duties were the same as always, seeing patients and performing surgery, however, the difference is that I have not been able to perform not only the number of surgeries, but I am also not able to perform any lengthy surgeries."  (J.A. 8.)  Thus, because plaintiff was able to perform certain duties during what Reliance determined to be the elimination period, plaintiff's claim was denied.

There is no dispute that plaintiff did not return to work for the period beginning April 27, 2002, and in fact, during the spring and summer of 2002, plaintiff underwent intense physical therapy and strength training – often for more than five hours per day.  (J.A. 96, 113.)  However, the court notes that the record is sparse concerning the extent of Kaelin's activities and abilities during this ninety-day period.  Additionally, based on the medical records that Kaelin has submitted, it is not clear that his condition actually changed from March 4, 2002, the day that he returned to work, and April 27, 2002, the day that he stopped working and sought disability.  Instead, Kaelin's decision to stop working again occurred almost immediately after Dr. White examined him on April 24, 2002 and determined that he was incapable of performing the duties of an orthopaedic surgeon.  Finally, the record is also unclear as to what duties Kaelin performed upon his return to work in August of 2002.  Nonetheless, as noted above, in scrutinizing Reliance's decision the court may review only the evidence that was before Reliance at the time the decision was made.  *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997).

The parties' dispute in this area centers on two topics: 1) whether Kaelin was able to perform surgeries during the elimination period, and 2) assuming that seeing patients was a material duty of Kaelin's occupation, whether Kaelin was able to see patients during the elimination period. These issues will be discussed in turn.

Kaelin provides strong medical evidence demonstrating that he was unable to perform surgeries during his elimination period. This includes reports from: Dr. White, noting on April 24, 2002 that Kaelin could stand for only short periods of time and was unable to perform the duties of an orthopaedic surgeon (J.A. 238); Dr. Neely, explaining that as of April 1, 2002, Kaelin suffered from "debilitating physical problems, which have the collective effect of rendering Dr. Kaelin totally disabled to practice as an orthopaedic surgeon" (J.A. 222); and Dr. Askin, noting that Kaelin would not have been able to perform surgeries full-time from the time of his injury because he lacked sufficient strength (J.A. 12). There is no evidence to the contrary. Thus, Reliance's decision otherwise was arbitrary and capricious.

However, there is some evidence that Kaelin's disability would not have prevented him from seeing patients and doing office work. First of all, Kaelin's doctors' notes tend to focus on his limitations in standing, strength, and stamina, which are more relevant to the strenuous demands of surgery than the sedentary nature of seeing patients. Additionally, Dr. Askin opined that Kaelin could continue to offer office hours. (J.A. 12.) Finally, it appears that Kaelin actually did continue to perform certain duties, including seeing patients, until late April 2002, and again in August of 2002. A chart documenting his patient visits shows that in March of 2002 he saw forty patients and in April of 2002 he saw thirty-four. (J.A. 56.) Thus, the fact that Kaelin performed these duties just prior to his elimination period, even to a limited extent,

36

provides some evidence of his capabilities.

On the other hand, there is also evidence that Kaelin's injuries were sufficiently serious to preclude him from seeing patients and doing office work.  First of all, the chart described above states that most of the patient visits attributed to Kaelin were actually performed by two other doctors, Drs. Fishbein and Petty.  (J.A. 56.)  Additionally, Kaelin's June 10, 2002 letter explains that he "require[d] assistance in the office" (J.A. 155), which seems to describe a limitation that extended even to seeing patients.  Further, the medical evidence that Kaelin submitted describes a man in severe pain, with a "number of significant orthopaedic concerns" (J.A. 11), who was unable to complete several everyday activities without assistance, including: standing for prolonged periods of time, tying his own mask, dressing himself, and tying his shoes (J.A. 96-98).  Indeed, during the spring and summer of 2002 Kaelin was undergoing intense physical therapy and strength training in an attempt to improve his condition, which often lasted for more than five hours a day.  (J.A. 96, 113.)  Finally, Kaelin should not be penalized for repeatedly striving to return to work, especially when his attempts were largely unsuccessful.  *Lasser* recognized this principle when it explained that a "claimant's return to work is not dispositive of his or her disability when economic necessity compels him or her to return to work."  344 F.3d at 392.  *See also Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (noting that "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling").

Reliance's final decision did not address the question of whether Kaelin was able to perform office work during his April 27, 2002 to July 25, 2002 elimination period.  The record as presently constituted also provides insufficient evidence to allow the court to resolve the

37

question, and it appears that further development and review of the record could yield a result favoring either side.  Accordingly, I will deny both motions for summary judgment on the issue.

**D.** **Plaintiff's Status under the Reliance Policy for the Period Following April 27, 2002 and his Eligibility for Benefits**

Reliance puts forth the alternative argument that even if the court were to determine that the elimination period began on April 27, 2002 – which it has – plaintiff was not entitled to disability coverage on that date, because the Reliance Policy covered only "each active, Full-time employed Physician," and defined Full-time as working a minimum of thirty-two hours per week. (Def.'s Resp. to Pl.'s Summ. J. Mem. 17; J.A. 175, 177 (italics added).)  Reliance points out that after June 28, 2001, plaintiff was working on a part-time basis and never worked thirty-two hours per week.  Reliance made this assertion in its final denial letter.

With respect to the issue of whether plaintiff was eligible for benefits on April 27, 2002, the court is guided by the Fourth Circuit's decision in *Tester v. Reliance Standard Insurance Co.*, 228 F.3d 372 (4th Cir. 2000).  In *Tester*, the pertinent provisions were almost identical to the ones in the present case, as the policy stated that "each active, Full-time and Part-time employee" was eligible for benefits, and that "Full-time" and "Part-time" were defined as an employee "who works a minimum of 20 hours during [the] person's regularly scheduled work week." *Tester*, 228 F.3d at 375.  Mrs. Tester took a leave of absence from her job on January 8, 1995, due to health problems. *Id.* at 374.  On February 15, 1995, Mrs. Tester died in an automobile accident, and at that time, she had yet to return from her leave of absence. *Id.*  Mr. Tester, Mrs. Tester's husband, applied to Reliance for death benefits on March 29, 1995, but Reliance denied the claim, finding that Mrs. Tester was no longer an "active, Full-time employee" as of January 8,

38

1995. *Id.* Thus, according to Reliance, Mrs. Tester was not a "member of the eligible class." *Id.*

The court in *Tester* ruled against Reliance, finding that Mrs. Tester was indeed an active employee at the time of her death, because: (1) there was no indication that her employer terminated her or temporarily laid her off; (2) there was no evidence that Mrs. Tester considered herself terminated; and (3) Mrs. Tester received a paycheck while she was on leave and submitted an insurance premium to Reliance, which was accepted the day after Mrs. Tester's death.  228 F.3d at 377.

In light of the *Tester* decision, the court concludes that plaintiff was an "active, Full-time employee" on April 27, 2002, because there is no indication that UMC terminated plaintiff or reduced his hours at any time before that date; UMC itself considered plaintiff to be a full-time employee; there is no evidence that plaintiff considered himself terminated at any time before that date; and, as plaintiff points out, he continued to receive his full-time salary until the summer of 2002.  (J.A. 218.)  In addition, plaintiff continued to pay, and Reliance continued to accept, all of the premiums for coverage through payroll deductions through that time.  (J.A. 201, 202, 218.) The attempt by Reliance to penalize plaintiff by transforming him into a part-time employee when he was attempting to perform his duties to the best of his physical abilities, and then deny him coverage because of this when he later became unable to perform even these limited duties because of the medical complications arising out of his original injuries, should not be countenanced.

In light of all of the foregoing, plaintiff's elimination period began on April 27, 2002, and he was not able to perform surgery during the elimination period.  However, there remain genuine issues as to: 1) whether Reliance acted arbitrarily and capriciously under the heightened

standard in determining that office work was a material duty of Kaelin's occupation, and 2) if office work was one of Kaelin's material duties, whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that he could perform office work during the elimination period.  Thus, I will deny both motions for summary judgment.[10]

### III.   Plaintiff's Motion to Strike or Stay Consideration of Portions of Reliance's Summary Judgment Motion

Plaintiff also seeks to strike or stay consideration of the portions of Reliance's motion for summary judgment that deal with plaintiff's claims of breach of fiduciary duty, unjust enrichment, and estoppel.  Pursuant to the parties' agreement and this court's corresponding order, this stage of the litigation is limited to the issue of plaintiff's entitlement to disability benefits under the Reliance Policy.  While Reliance's arguments concerning breach of fiduciary duty, unjust enrichment, and estoppel do appear to be separate issues from plaintiff's entitlement to disability benefits, because I will deny Reliance's motion for summary judgment, the issue is moot.  Accordingly, I will deny Kaelin's motion.

### CONCLUSION

For all of the foregoing reasons: (1) plaintiff's motion for summary judgment will be

---

[10] In a Fourth Circuit case where the court determined that the insurer had analyzed the claimant's claim based on an incorrect elimination period, the court remanded the case to the district court with instructions that the district court remand to the insurer for further administrative review.  *Evans v. Metropolitan Life Ins. Co.*, 358 F.3d 307, 312 (2004); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2nd Cir. 1995) (ruling that "if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality'"); *Lasser v. Reliance Standard Life Ins. Co.*, 130 F. Supp. 2d 616, 629 (D.N.J. 2001) (noting that "where an administrator's arbitrary and capricious resolution of an antecedent factual issue has caused error at a later stage of the analysis, remand to permit a fuller development of the record might well be appropriate").

denied; (2) Reliance's motion for summary judgment will be denied; (3) plaintiff's motion to strike or stay consideration of portions of Reliance's motion for summary judgment will be dismissed as moot.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| CHARLES R. KAELIN, M.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| TENET EMPLOYEE BENEFIT PLAN, | : | NO. 04-2871 |
| BENEFITS ADMINISTRATION COMMITTEE | : | |
| OF THE TENET EMPLOYEE BENEFIT PLAN, | : | |
| RELIANCE STANDARD LIFE INSURANCE | : | |
| COMPANY, and TENET HEALTHCARE | : | |
| CORPORATION, | : | |
| Defendants. | : | |

## Order

**AND NOW**, this _____ day of December, 2005, upon consideration of plaintiff's motion

for summary judgment (Document No. 38), the motion for summary judgment of defendant

Reliance (Document No. 37) and the responses and replies thereto and the letter submissions, **IT**

**IS HEREBY ORDERED** that the motion of plaintiff Charles B. Kaelin, M.D. is **DENIED** and

the motion of defendant Reliance Standard Life Insurance Company is **DENIED**.

**IT IS FURTHER ORDERED** that the motion of Charles R. Kaelin, M.D. to strike or

stay consideration of portions of defendant Reliance Standard Life Insurance Company's motion

for summary judgment (Document No. 41) is **DISMISSED AS MOOT**.

A status conference is **SCHEDULED** for **January 6, 2006 at 2:00 p.m.** in Chambers.

_____
William H. Yohn, Jr., Judge