## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| CHARLES R. KAELIN, M.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| TENET EMPLOYEE BENEFIT PLAN, | : | NO. 04-2871 |
| BENEFITS ADMINISTRATION COMMITTEE | : | |
| OF THE TENET EMPLOYEE BENEFIT PLAN, | : | |
| RELIANCE STANDARD LIFE INSURANCE | : | |
| COMPANY, and TENET HEALTHCARE | | |
| CORPORATION, | | |
| Defendants. | | |

## Memorandum and Order

YOHN, J.                                                          March ___, 2006

   Defendant Reliance Standard Life Insurance Company ("Reliance") brings this motion

for reconsideration, seeking to have the court reconsider one issue from its December 20, 2005

Memorandum and Order, in which the court denied both Reliance's and plaintiff Charles R.

Kaelin's motions for summary judgment.  Specifically, Reliance asks the court to reconsider its

ruling that Kaelin was eligible for coverage (although not necessarily entitled to benefits) under

the Reliance policy on April 27, 2002, the date on which Kaelin claims his period of disability

began.  For the reasons that follow, the court will deny Reliance's motion for reconsideration.

**I. Factual and Procedural Background**[1]

From November 28, 1995 to September 4, 2003, Kaelin, a board-certified and licensed orthopedic surgeon, practiced medicine under an employment contract with National Medical Hospital of Wilson County, Inc., d/b/a University Medical Center ("UMC"), in Lebanon, Tennessee.  (Pl.'s Stmt. of Material Facts/Def.'s Response ("Agreed Facts") ¶¶ 3-4.)  UMC was an indirect subsidiary of Tenet until November 1, 2003.  (*Id.* at ¶ 5.)  Tenet purchased the Reliance policy (Policy No. LSC 103763), a policy of group long-term disability insurance that became effective January 1, 2000.  (*Id.* at ¶ 6; Joint Appendix 169-98.)

The Reliance policy was part of the Tenet Employee Benefit Plan ("the Plan"), which at the time relevant to this case, was a "welfare plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1), and which was sponsored by Tenet.  (Agreed Facts ¶ 7.)  Plaintiff was a "participant" in the Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), as to coverage under the Reliance policy, and he paid all of the premiums for his long-term disability coverage under the Plan with after-tax dollars through payroll deductions in the amount of $160 per bi-weekly payroll period.  (*Id.* at ¶¶ 8, 12; *see, e.g.,* J.A. 218.)  Reliance was solely responsible for adjudication and payment of claims under the Reliance policy.  (Agreed Facts ¶ 13.)

The Reliance policy states that in order to be eligible for coverage, the insured must be an "active, Full-time employed Physician."  (J.A. 175.)  The policy defines a "full-time" employee

---

[1] This section is an abridged version of the Factual Background part of the court's December 20, 2005 opinion.  *See Kaelin v. Tenet Employee Benefit Plan*, 405 F. Supp. 2d 562 (E.D. Pa. 2005).  In this section the court will repeat only the facts directly relevant to the motion presently at issue.

as one who "work[s] for you for a minimum of 32 hours during a person's regular work week." (J.A. 177.) Additionally, the policy provides that "the insurance of an Insured will terminate" on "the date the Insured ceases to meet the Eligibility Requirements." (J.A. 184.)

On June 28, 2001, plaintiff was injured in a jet ski accident, which resulted in various injuries to his right knee and leg. (Agreed Facts ¶ 14; J.A. 153.) Following the accident, plaintiff stopped working full-time at UMC and did not return to work at all for approximately one month. (Agreed Facts ¶ 17.)

Plaintiff returned to work at UMC on August 1, 2001 and worked on a reduced hours/intermittent leave basis from that date until January 21, 2002, when he ceased working to undergo reconstructive surgery on his right knee – surgery that resulted in increased knee pain. (*Id.* at ¶ 20; J.A. 266-68.) On March 4, 2002, Kaelin again returned to work on a part-time basis, and continued through April 26, 2002, when he again stopped working due to his injuries. (J.A. 206.) Kaelin eventually returned to work again on August 15, 2002, before stopping again in January of 2003. (J.A. 33, 56, 229.)

When plaintiff ceased work on April 26, 2002, he timely applied for long-term disability benefits under the Plan on Reliance's standard claim form. (Agreed Facts ¶ 23, 25; J.A. 206-11.) Reliance received plaintiff's claim forms on May 7, 2002. (J.A. 206.)

By letter dated July 25, 2002, Reliance denied plaintiff's claim for benefits, stating that plaintiff's "original date of loss was June 29, 2001." (J.A. 152-54.) Reliance concluded that plaintiff was "not totally disabled from performing each and every material duty of [his] occupation during the elimination period and [did] not meet the qualifications of disability as outlined in the policy." (J.A. 154.)

3

By letter dated August 7, 2002, plaintiff requested a review of Reliance's denial of disability benefits, stated that he "did NOT apply for full time disability until April 26, 2002," and notified Reliance that he "anticipate[d] going back to part-time work on Wednesday, August 14, 2002." (J.A. 149.)  Reliance responded on August 21, 2002, stating that it would "be making *a new determination* and will send a new letter regarding your claim now that we know of the error." ( J.A. 134 (italics added).)  The "error" was Reliance's statement in the initial claim denial that plaintiff's original date of loss was June 29, 2001.

By letter dated September 20, 2002, Reliance notified plaintiff that it had completed its evaluation of his "2nd application for Long Term Disability benefits," and that he had been denied. (J.A. 112-15.)  Reliance found that "[e]ven though there are some restrictions to the type and duration of surgeries you can perform, you do not meet the definition of total disability as it is written according to the [Reliance policy]." (J.A. 114.)  Reliance corrected the previous "error" and acknowledged that plaintiff "last worked on April 26, 2002 and his elimination period was over July 25, 2002." (J.A. 117.)

Plaintiff timely appealed the September 20, 2002 adverse benefit determination by letter dated November 6, 2002, and by letter dated February 3, 2003, Reliance once again denied the claim, stating that it had determined that he was not totally disabled under the terms of the Reliance policy.  (Agreed Facts ¶¶ 42-43, 45, 48; J.A. 99-106, 109, 85, 5-10.)  In this February 3 letter, Reliance determined that plaintiff's elimination period ran from June 28, 2001 through September 26, 2001, despite the fact that this determination was contrary to that in the September 20, 2002 denial of benefits.  (Agreed Facts ¶ 49.)  In addition to finding that Kaelin was not totally disabled during the elimination period, Reliance also determined that Kaelin had ceased

4

being a full-time employee of UMC on August 1, 2001, and therefore his eligibility for coverage under the Reliance policy had terminated on that date.  (J.A. 7-9; Agreed Facts ¶ 53.)

On February 4, 2005, Kaelin filed an eight-count amended complaint against defendants the Tenet Employee Benefit Plan, the Benefits Administration Committee of the Tenet Employee Benefit Plan ("the Committee"), Reliance Standard Life Insurance Company ("Reliance"), and Tenet Healthcare Corporation ("Tenet").  On May 9, 2005, Kaelin filed a motion for summary judgment, arguing that he was entitled to benefits under the Reliance policy.  On the same date, Reliance also filed a motion for summary judgment, arguing that Kaelin was not entitled to benefits, both because he was not "totally disabled" during the elimination period and because he was not eligible for coverage on April 27, 2002.

On December 20, 2005, the court denied both sides' motions for summary judgment.  *See Kaelin v. Tenet Employee Benefit Plan*, 405 F. Supp. 2d 562 (E.D. Pa. 2005).  The court first analyzed Reliance's structural conflicts of interest and the procedural anomalies in its review of Kaelin's claim, as directed by *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir. 2000), and determined that a significantly heightened arbitrary and capricious standard of review applied.  Accordingly, the court stated that while it could not "'substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard,'" *Kaelin*, 405 F. Supp. 2d at 580 (quoting *Stratton v. E.I. Dupont De Nemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004)), it would "'examine the facts before the administrator with a high degree of skepticism,'" *id.* (quoting *Pinto*, 214 F.3d at 394).  The court also found that Kaelin's elimination period began on April 27, 2002 and that he was not able to perform surgery during the elimination period.  However, the court found that there remained

5

genuine issues as to: 1) whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that office work was a material duty of Kaelin's occupation; and 2) if office work were one of Kaelin's material duties, whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that he could perform office work during the elimination period.

As part of the court's ruling that Kaelin's elimination period began on April 27, 2002, the court determined that Kaelin was eligible for coverage under the Reliance policy on that date. In so ruling, the court was guided by *Tester v. Reliance Standard Insurance Co.*, 228 F.3d 372 (4th Cir. 2000). In *Tester*, the policy stated that "each active, Full-time and Part-time employee" was eligible for benefits, and that an employee worked "Full-time" or "Part-time" if he or she worked "a minimum of 20 hours during [the] person's regularly scheduled work week." *Tester*, 228 F.3d at 375. Mrs. Tester took a leave of absence from her job on January 8, 1995, due to health problems. *Id.* at 374. On February 15, 1995, Mrs. Tester died in an automobile accident, and at that time, she had yet to return from her leave of absence. *Id.* Mr. Tester, Mrs. Tester's husband, applied to Reliance for death benefits on March 29, 1995, but Reliance denied the claim, finding that Mrs. Tester was no longer an "active, Full-time employee" as of January 8, 1995. *Id.* Thus, according to Reliance, Mrs. Tester was not a "member of the eligible class." *Id.* The court in *Tester* ruled against Reliance, finding that Mrs. Tester was indeed an active employee at the time of her death, because: 1) there was no indication that her employer terminated her or temporarily laid her off; 2) there was no evidence that Mrs. Tester considered herself terminated; and 3) Mrs. Tester received a paycheck while she was on leave and submitted an insurance premium to Reliance, which was accepted the day after Mrs. Tester's death. *Id.* at 377.

6

In concluding that Kaelin was eligible for coverage on April 27, 2002, this court stated that:

> there is no indication that UMC terminated plaintiff or reduced his hours at any time before that date; UMC itself considered plaintiff to be a full-time employee; there is no evidence that plaintiff considered himself terminated at any time before that date; and, as plaintiff points out, he continued to receive his full-time salary until the summer of 2002.  (J.A. 218.)  In addition, plaintiff continued to pay, and Reliance continued to accept, all of the premiums for coverage through payroll deductions through that time.  (J.A. 201, 202, 218.)

*Kaelin*, 405 F. Supp. 2d at 596.

On December 28, 2005, Reliance filed a motion for reconsideration, challenging only the court's ruling that Kaelin was eligible for coverage under the Reliance policy on April 27, 2002. Reliance argues that because Kaelin started working part-time on August 1, 2001, he was no longer a full-time employee and thus not eligible for coverage.

## II. Legal Standard

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).  Reconsideration is proper where the moving party demonstrates one of three grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).  Motions for reconsideration "may not be used 'as a means to argue new facts or issues that inexcusably were not presented to the court in

7

the matter previously decided.'"  *Johnson v. Diamond State Port Corp.*, 50 Fed. Appx. 554, 560

(3d Cir. 2002) (quoting *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990));

*see also Rock v. Voshell*, 2005 WL 3557841, at *1 (E.D. Pa. Dec. 29, 2005) ("Mere

dissatisfaction with the Court's ruling is not the basis for such a reconsideration, nor can such a

motion be used as a means to put forth additional arguments which could have been made but

which the party neglected to make.").


**III. Discussion**

Reliance argues that the court, in ruling that Kaelin was eligible for coverage under the

Reliance policy on April 27, 2002, made a clear error of law.  Specifically, Reliance argues that

the court erred in relying on *Tester v. Reliance Standard Life Insurance Co.*, 228 F.3d 372 (4th

Cir. 2000), and that the court should have found that Kaelin was not an "active, full-time"

employee under the terms of the policy.

Reliance's first criticism of the court's use of *Tester* is that the policies were different: in

*Tester*, part-time and full-time employees were eligible for coverage, while in this case, only full-

time employees were covered.  This distinction, however, is of no consequence.  The point the

court drew from *Tester* was that an employee could maintain active, full-time status even if the

employee did not always satisfy the policy's minimum-hour requirement.  In *Tester*, the

employee was required to work a minimum of twenty hours a week to be considered part-time.

*Id.* at 374.  At the time Tester was killed, she was not working at all.  *Id.*  Nonetheless, the court

concluded that she continued to be eligible for benefits.  *Id.* at 377.  Similarly, in this case Kaelin

was not working thirty-two hours a week immediately before he applied for benefits.

Second, Reliance argues that it was inappropriate for the court to rely on *Tester* because in *Tester* the court reviewed the insurance benefits decision *de novo*, while in this case, the court reviewed Reliance's determination under a heightened version of the arbitrary and capricious standard. The difference in standards is important, of course, but it does not eliminate all of the instructive power of *Tester*. Thus, it was still appropriate for the court consider some of the factors that *Tester* suggested to determine whether Reliance erred; in this case the court simply must review Reliance's decision with a greater degree of deference. *See Pinto*, 214 F.3d at 394 (stating that the court must "examine the facts before the administrator with a high degree of skepticism").

Finally, Reliance argues that *Tester* is distinguishable because Tester had been out of work for about five weeks when she was killed, while Kaelin worked part-time (or not at all) for ten months before he claimed benefits. The court first notes that it is not at all clear that this factual distinction could amount to a clear error of law that would entitle Reliance to relief through a motion for reconsideration. Nonetheless, the court will proceed to the merits.

This distinction highlights the difference between the relevant policy language in *Tester* and this case. In *Tester*, the court found that the key undefined term was "active," and the issue was whether Tester remained an active employee even though she had not worked for over a month. 228 F.3d at 374-75. In this case, it does not appear that there is any question whether Kaelin was active during the relevant time period;[2] he worked, but only part-time. Instead,

_____

[2] Reliance seems to contend that in the policy's eligibility section (which states that "each active, Full-time employed Physician" is eligible), "active" modifies "full-time." However, the fact that the two terms are separated by a comma leads the court to conclude that both terms individually modify "physician." *See* Bryan A. Garner, *Garner's Modern American Usage* 655 (Oxford University Press 2003) (explaining that a comma is used to "separate[] adjectives that

9

Reliance argues that Kaelin lost eligibility because he did not work full-time.  As noted above, the policy defines a full-time employee as one who "work[s] for you for a minimum of 32 hours during a person's regular work week."  (J.A.  177.)  Kaelin argues that his "regular work week" was still full-time on April 27, 2002, while Reliance's final denial took the position that once Kaelin worked part-time on August 1, 2001, his regular work week was immediately transformed to part-time (J.A. 10).  Thus, the court must determine whether Reliance's interpretation and application of "regular work week," a phrase not defined by the policy, was arbitrary and capricious under the heightened standard.

The court does find that Reliance's determination was arbitrary and capricious under the heightened standard.  There is no dispute that Kaelin worked full-time from November 28, 1995 until June 27, 2001.  Indeed, he regularly worked twelve to twenty-four-hour days during that period.  (J.A. 210.)  Then, when he returned from his injury, on August 1, 2001, he worked only part-time.  It was inappropriate for Reliance to convert six-and-a-half years of regular full-time service to part-time after a single day of part-time work, even under a heightened arbitrary and capricious standard.  The court finds that the fact that Kaelin continued to work part-time through April 26, 2002 does not change that conclusion.  Throughout this period, UMC was still paying Kaelin his full-time salary and stated that his regularly scheduled work week was "40+" hours.[3] (J.A. 202.)  Additionally, the medical evidence shows that Kaelin worked hard on his rehabilitation and pursued an aggressive course of treatment in an attempt to resume his full-time

_____

each qualify a noun in the same way"; while no comma is used "when one adjective qualifies a noun phrase containing another adjective").

[3] The court also notes that the policy language refers to an active, full-time employed physician.  It is clear that as of April 27, 2002, Kaelin was still *employed* on a full-time basis.

practice.  (J.A. 15-16, 266.)  Based on these factors, the court finds that Kaelin's part-time

schedule was an exception to his regular full-time schedule, not a new regular schedule.

Reliance's determination to the contrary was arbitrary and capricious under the heightened

standard.

This conclusion is fortified by the fact that under Reliance's view, an insured would be

harmed by attempting to return to work.  In order to protect eligibility, the insured would have to

stay out of work, even if he believed that he could return on an incremental basis.  Such a gradual

return would be extremely risky: if the insured guessed wrong, and after attempting to return

either realized it was not feasible or exacerbated the initial injury (like in Kaelin's case), he

would no longer be eligible for benefits.  As the court stated in its initial opinion, "[t]he attempt

by Reliance to penalize plaintiff by transforming him into a part-time employee when he was

attempting to perform his duties to the best of his physical abilities, and then deny him coverage

because of this when he later became unable to perform even these limited duties because of the

medical complications arising out of his original injuries, should not be countenanced."  *Kaelin*,

405 F. Supp. 2d at 586.

*Epright v. Environmental Resources Management, Inc. Health & Welfare Plan*, 81 F.3d

335 (3d Cir. 1996), does not change this analysis.  In *Epright*, an administrator argued that an

employee was not eligible for insurance coverage because he was hired as a temporary employee.

*Id.* at 339.  However, the plan itself did not preclude coverage for temporary employees; rather, it

stated that "active, full-time employees" were eligible, and defined "active, full-time employee"

as one who "regularly works 30 hours or more each week."  *Id.* at 338.  The administrator

attempted to introduce extrinsic evidence to show that temporary employees were not covered;

11

however, the Third Circuit held that the term "full-time employee" was not ambiguous and that it was the plan's definition, not extrinsic evidence, that defined the term. *Id.* at 340. In this case the court also finds that the plan's definition of full-time employee controls, which is entirely consonant with *Epright*. The issue in this case was not present in *Epright*: here, the dispute concerns what Kaelin's regular hours were, while in *Epright* there was no dispute on that point. Thus, while the policy language here and in *Epright* is similar, *Epright* provides limited guidance.

Additionally, *Carr v. Reliance Standard Life Insurance Co.*, 363 F.3d 604 (6th Cir. 2004), is also not as helpful as Reliance contends. Reliance is correct that the facts of *Carr* are very similar to those of this case. In *Carr*, Carr worked full-time for his company until June 27, 1999, when he left his job for medical treatment. *Id.* at 605. He returned to work part-time on August 16, 1999, and eventually quit for good on January 14, 2000. *Id.* Reliance determined that Carr was not disabled during the period beginning June 26, 1999 because he worked during the elimination period, and thereby demonstrated an ability to perform at least some of his material duties. *Id.* at 606. Reliance also determined that Carr was not eligible for coverage on any date after August 16, 1999, because he no longer worked full-time. *Id.* However, Reliance's second determination, which is the one at issue in this case, was not addressed in *Carr*. Carr sought benefits beginning June 26, and the courts denied him relief. *Id.* The Sixth Circuit did not review Reliance's finding that Carr was not eligible for coverage after August 16, 1999.

Based on these considerations, the court will deny Reliance's motion for reconsideration. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARLES R. KAELIN, M.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| TENET EMPLOYEE BENEFIT PLAN, | : | NO. 04-2871 |
| BENEFITS ADMINISTRATION COMMITTEE | : | |
| OF THE TENET EMPLOYEE BENEFIT PLAN, | : | |
| RELIANCE STANDARD LIFE INSURANCE | : | |
| COMPANY, and TENET HEALTHCARE | : | |
| CORPORATION, | : | |
| Defendants. | : | |

## Order

AND NOW, this _____ day of March, 2006, upon consideration of defendant Reliance

Standard Life Insurance Company's Motion for Reconsideration (Doc. No. 47), plaintiff Charles

R. Kaelin's Memorandum of Law in Opposition to the Motion for Reconsideration, and

Reliance's Reply thereto, IT IS HEREBY ORDERED that Reliance's Motion for

Reconsideration is DENIED.


/s William H. Yohn, Jr., Judge

_____

William H. Yohn, Jr., Judge