# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARLES R. KAELIN, M.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| TENET EMPLOYEE BENEFIT PLAN, | : | NO. 04-2871 |
| BENEFITS ADMINISTRATION COMMITTEE | : | |
| OF THE TENET EMPLOYEE BENEFIT PLAN, | : | |
| RELIANCE STANDARD LIFE INSURANCE | : | |
| COMPANY, and TENET HEALTHCARE | : | |
| CORPORATION, | : | |
| Defendants. | : | |

## Memorandum and Order

YOHN, J.                                                          November ___, 2007

Plaintiff Charles R. Kaelin, M.D. filed this action under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, against defendants the Tenet

Employee Benefit Plan ("the Plan"), the Benefits Administration Committee of the Tenet

Employee Benefit Plan, Reliance Standard Life Insurance Company ("Reliance"), and Tenet

Healthcare Corporation ("Tenet").[1]  The eight-count amended complaint contains several causes

of action against these four defendants, all of which stem from a policy of group long-term

disability insurance ("the Reliance policy") that was issued by Reliance to Tenet, plaintiff's

former employer.  The Reliance policy was part of the Plan, which is a "welfare plan" within the

---

[1] Plaintiff also sued Wachovia Bank in his original complaint, but the parties later agreed
to a voluntary dismissal of the bank.

1

meaning of ERISA.  Currently pending before the court are Kaelin's second motion for summary judgment and Reliance's cross-motion for summary judgment, which deal only with Count I of Kaelin's amended complaint.  For the following reasons, I will grant Kaelin's motion and deny Reliance's motion.

I.      **Background and Procedural History**

The factual and procedural events leading up to Reliance's original final denial of Kaelin's long-term disability insurance claim on February 3, 2003 are detailed in the memorandum accompanying the order denying the parties' first motions for summary judgment. *See Kaelin v. Tenet Employee Benefit Plan*, 405 F. Supp. 2d 562 (E.D. Pa. 2005).  I include here only enough of that background to provide context for this memorandum and order.  Plaintiff, a board-certified and licensed orthopedic surgeon who practiced under an employment contract with National Medical Hospital of Wilson County, Inc., d/b/a University Medical Center ("UMC") in Lebanon, Tennessee, was injured in a jet ski accident on June 28, 2001.  Kaelin returned to work on a reduced-hours schedule on August 1, 2001.  He took time off to have and recover from knee surgery beginning on January 21, 2002; he returned to work on March 4, 2002.  He stopped working again on April 26, 2002 and timely applied for disability benefits under the Reliance policy.

The Reliance policy's benefits are paid as follows:

We will pay a Monthly Benefit if an Insured:
 (1) is Totally Disabled as the result of a Sickness or Injury covered by this
   Policy;
 (2) is under the regular care of a Physician;
 (3) has completed the Elimination Period; and

>        (4)    submits satisfactory proof of Total Disability to us.

(A.R. 1065.)

>        "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>        (1)    during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation; and
>        (2)    for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>            (a)    "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period.

(A.R. 1057.)  "'Elimination Period' means a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable.  It begins on the first day of total disability."  (A.R. 1056.)  The elimination period under Kaelin's policy is "90 consecutive days of Total Disability."  (A.R. 1054.)  This period began on April 27, 2002 and ended on July 25, 2002.  Therefore, July 26, 2002 was the first day on which Kaelin was eligible for benefits under the Reliance policy.

Plaintiff's first application for benefits was denied.  (A.R. 1031-33.)  Plaintiff requested review of the denial because Reliance had relied on incorrect dates.  Reliance agreed to make a new determination using the correct date of loss, and this second application for benefits was denied.  (A.R. 992-95.)  Plaintiff again requested review, and his claim was denied again upon final review (referred to throughout as the "original final denial").  (A.R. 885-90.)  Plaintiff then filed suit in this court.

3

This is plaintiff's second motion for summary judgment.  By memorandum and order dated December 20, 2005, this court denied plaintiff's first motion for summary judgment, as well as Reliance's cross-motion for summary judgment.  *See Kaelin*, 405 F. Supp. 2d at 585. Applying a "significantly heightened arbitrary and capricious standard of review," *id.* at 580, I "examine[d] the facts before the administrator with a high degree of skepticism."  *Id.* (quoting *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 394 (3d Cir. 2000)).  I concluded:

> plaintiff's elimination period began on April 27, 2002, and he was not able to perform surgery during the elimination period.  However, there remain genuine issues as to:  1) whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that office work was a material duty of Kaelin's occupation, and 2) if office work was one of Kaelin's material duties, whether Reliance acted arbitrarily and capriciously under the heightened standard in determining that he could perform office work during the elimination period.

*Id.* at 586.  In a separate memorandum and order, I remanded the issues of Kaelin's material duties and his ability to perform those duties to Reliance for determination using the correct elimination period.  *See Kaelin v. Tenet Employee Benefit Plan*, No. 04-2871, 2006 WL 2382005, at *8 (E.D. Pa. Aug. 16, 2006).  I ordered Reliance to complete the review by March 22, 2007.  (Order dated Feb. 13, 2007, No. 04-2871, Docket No. 67.)  In a letter dated March 26, 2007, Reliance concluded that Kaelin is not eligible for benefits:

> [W]e have concluded that you are not entitled to benefits under the terms of your Policy.  In specific response to Judge Yohn's questions on remand: 1) we have found that surgery is not the only material duty of your regular occupation and seeing patients is an example of one additional duty which would be considered material; and 2) we have concluded that you remained capable of performing at least some of the material duties of your regular occupation during the Elimination Period which ran from April 26, 2002 through July 25, 2002.

(A.R. 10-11.)

The question now before the court is whether this determination was arbitrary and

4

capricious under significantly heightened scrutiny.  Kaelin asserts that, in reaching its conclusion

on remand, Reliance improperly (1) considered plaintiff's "regular occupation" to be a part-time

orthopedic surgeon; (2) determined that plaintiff's material duties include seeing patients in the

office and casting, without considering plaintiff's proof of the materiality of his duties; and (3)

determined, based on speculation and in the face of assertions to the contrary, that plaintiff could

have seen patients during the elimination period.  In its cross-motion for summary judgment,

Reliance asserts that (1) the law requires looking to the time immediately before the elimination

period, not immediately before plaintiff's accident, in determining plaintiff's material duties; (2)

the relevant question in determining material duties is what percentage of plaintiff's work (rather

than billings) involved the duties; and (3) no evidence suggests that plaintiff could not continue

performing the same material duties he performed immediately prior to the elimination period.


II.     **Standard of Review**

        I review Reliance's denial of benefits under a significantly heightened arbitrary and

capricious standard of review.  *See Kaelin*, 405 F. Supp. 2d at 580.  While the court "may not

substitute its own judgment for that of plan administrators," "I will examine the facts before the

administrator with a high degree of skepticism."  *Id.* (quoting *Stratton v. E.I. DuPont De

Nemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004); *Pinto*, 214 F.3d at 394).  Reliance's

determination will be overturned "only if it is 'without reason, unsupported by substantial

evidence or erroneous as a matter of law.'" *Id.* at 573 (quoting *Abnathya v. Hoffmann-La Roche,

Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).

        Although Kaelin suggests that de novo review is now appropriate, as Reliance did not

exercise its discretion to adjudicate plaintiff's claim before the end of the period set by this court (Pl.'s Mem. in Support of Pl.'s Second Mot. for Summary Judgment 19), I will again use the arbitrary and capricious standard that I used to decide the first set of motions for summary judgment.  As I explained previously, an arbitrary and capricious standard of review applies when the plan gives the administrator discretion to determine eligibility for benefits or to construe the plan's terms.  *Kaelin*, 405 F. Supp. 2d at 572.  The parties did not then and do not now dispute that the Reliance Plan gives Reliance this discretion.  Instead, plaintiff argues that Reliance is no longer entitled to a deferential standard of review because, by notifying plaintiff of its decision to deny benefits after the expiration of the deadline set by this court, it "forfeited the privilege to apply [its] discretion."  (Pl.'s Mem. 20.)  The case law from this jurisdiction does not compel that conclusion under the facts presented here.

In *Gritzer v. CBS, Inc.*, the Third Circuit applied de novo review when "there simply [was] no analysis or 'reasoning' to which the Court may defer under the arbitrary and capricious standard" because the defendant "apparently never made any effort to analyze appellants' claims much less to advise them of what that analysis disclosed until after th[e] litigation was filed." 275 F.3d 291, 295-96 (3d Cir. 2002).  Similarly, in *Moench v. Robertson*, the Third Circuit applied a de novo standard where "the record [was] devoid of any evidence that the Committee construed the plan at all." 62 F.3d 553, 567 (3d Cir. 1995).  In the instant case, however, Reliance clearly interpreted the Reliance Plan and made discretionary decisions, both prior to the lawsuit being filed and during its review on remand.  A delay of two business days in notifying the plaintiff is not a failure to exercise discretion sufficient to compel a de novo standard of

review.[2]

In further support of de novo review, plaintiff argues that Reliance's failure to decide the claim by the court's deadline led to a "deemed denial" of Kaelin's claim that warrants de novo review. Previous ERISA regulations provided for deemed denials when the claims administrator failed to comply with ERISA's claim procedures. The "deemed denial" language, however, was removed from the amended regulation that applies to plaintiff's claim. *See* 29 C.F.R. § 2560.503-1(h); Pension and Welfare Benefits Administration, 65 Fed. Reg. 70246, 70265, 70268-69 (Nov. 21, 2000) (explaining the changes to the regulations effective January 1, 2002). Furthermore, even if the "deemed denial" language "lives on," as plaintiff claims (Pl.'s Mem. 21), Reliance's substantial compliance with this court's order would not require a deemed denial. Although the courts of appeals are split on the issue, "[a] majority of circuits have held that, absent substantial compliance with the deadlines, de novo review applies on the grounds that inaction is not a valid exercise of discretion and leaves the court without any decision or application of expertise to which to defer." *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005) (agreeing with the majority view and also citing *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d at 1098, 1106-07 (9th Cir. 2003); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 632-33 (10th Cir. 2003); *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002) in support of that view). I agree with the majority that substantial compliance is sufficient, and I find that Reliance has substantially complied with the deadline.

In the alternative, plaintiff urges this court to adopt an arbitrary and capricious standard

---

[2] The representative of Reliance who issued the denial letter stated that while preparing the final draft he "took ill with some flu-like symptoms and gastrointestinal issues and had to leave for the day." (A.R. 1.)

with even more heightened scrutiny.  (Pl.'s Mem. 19.)  Plaintiff himself asks, however, "How much more deference can be taken away without there being a *de novo* review?  If the Court is inclined to reduce its deference further, how should the Court describe the contours of its review giving even less deference than the standard it has chosen?"  (*Id.* at 18-19.)  In light of these line-drawing difficulties, and for the reasons described above to reject de novo review, I will apply the same significantly heightened arbitrary and capricious standard used in resolving the first summary judgment motions.

**III.    Discussion**

Reliance is obligated to pay long-term disability benefits to Kaelin if, during the ninety-day elimination period, he could not perform each and every material duty of his regular occupation.  In determining whether Reliance arbitrarily and capriciously denied Kaelin benefits, and in light of the parties' briefing on their second cross-motions for summary judgment, I must first resolve the threshold issue of the meaning of "immediately before the onset of disability," which the parties continue to debate, so as to ascertain the time period used in determining plaintiff's "regular occupation."  I must then decide whether Reliance's determination that plaintiff's material duties included tasks other than surgery was arbitrary and capricious. Because I decide that seeing patients in the office and casting were not material duties of Kaelin's regular occupation, I need not decide whether Reliance's determination that plaintiff could see patients in the office during the elimination period was arbitrary and capricious.

A.      **Definition of "Regular Occupation"**

In denying the parties' first motions for summary judgment, I briefly explained that

"regular occupation" is "the usual work that the insured is actually performing immediately

before the onset of disability." *Kaelin*, 405 F. Supp. 2d at 582 (quoting *Lasser v. Reliance*

*Standard Life Ins. Co.*, 344 F.3d, 381, 386 (3d Cir. 2003)). "Thus, it is the specific job duties of

the individual that are important, rather than a general job title. Accordingly, Kaelin's regular

occupation was the work that he completed in his employment for UMC before April 27, 2002."

*Id.* This statement was made without analysis and was based solely on the Third Circuit's

language quoted above. The parties continue to dispute the date of "the onset of disability."

In its denial on remand, Reliance included the following analysis:

> The 3rd Circuit noted that "'Regular occupation' is the usual work that the Insured
> is actually performing immediately before the onset of disability." Judge Yohn
> determined that your Elimination Period began on April 26, 2007. As such, in order
> to determine what constituted your regular occupation, we need to look to the duties
> you were performing immediately prior to April 26, 2007.

(A.R. 2-3 (internal citation omitted).) In its cross-motion for summary judgment, Reliance

argues that, "if [Kaelin's] claimed disability began on April 26, 2002 as he now claims, the

[c]ourt must look to the material duties he was actually performing immediately before that

date." (Def.'s Mem. 14.) Kaelin responds by construing *Lasser* to hold that "regular

occupation" includes the work the insured "was *actually engaged to do* immediately before

becoming disabled, as opposed to what may be indicated by a labor market survey or the

Dictionary of Occupational Titles."[3] (Pl.'s Reply Mem. 4.) Therefore, I will engage in a more

---

[3] This is not a precise statement of the court's holding. The court did conclude that it
must look at the insured's specific job, not a more general definition provided by a third-party
source. *Lasser*, 344 F.3d at 386. But the court did not hold that it must look from the

9

extensive analysis here, and ultimately will reach the conclusion that the correct time period for

determining an insured's regular occupation is the period before the date of injury, not the first

day of the elimination period.  The statement otherwise in my opinion disposing of the first

summary judgment motions was incorrect.  I note, however, that even if I were to use the first

day of the elimination period, I would arrive at the same ultimate conclusion—that Kaelin's

material duties did not include office visits.[4]

---

perspective of the employer ("engaged to do").  Instead, a court must look from the perspective of the employee, at what work he is "actually performing" and "in which he was actually engaged."  *Id.* at 386, 392.  Nevertheless, as explained below, the work the insured was engaged to do may be relevant.

 [4] The definition of the insured's regular occupation provided by the insured's employer is highly relevant to the analysis, and taking that into account leads to the conclusion that, even immediately before the elimination period began, Kaelin's regular occupation centered on performance of orthopedic surgery.

 Courts in this district considering denials of long-term disability insurance under Reliance policies have based their decisions on the employer's statement of the insured's occupation  *See, e.g.*, *McCloskey v. Reliance Standard Life Ins. Co.*, No. 02:03CV579, 2006 WL 1437171, at *9 (W.D. Pa. Mar. 16, 2006) (determining the insured's regular occupation "with reference to specific duties performed for [the insured's] employer," including the "qualifications set forth by [the insured's employer]" in, among other places, Reliance's Occupational Analysis form to be completed by the employer); *Sexton v. Group Long Term Disability Plan for Employees of Inmar Enters., Inc.*, No. 3:04CV2475, 2006 WL 559908, at *5 (M.D. Pa. Mar. 7, 2006) (evaluating Reliance's denial of benefits by applying the *Lasser* definition and relying on the "Occupational Analysis completed by the employer for Defendant Reliance" in determining the insured's regular occupation); *Small v. First Reliance Standard Life Ins. Co.*, No. 02-3744, 2005 WL 486614, at *5 (E.D. Pa. Feb. 28, 2005) (citing *Lasser* and relying on the insured's "job description, according to her occupational analysis and her employer"); *Byrd v. Reliance Standard Life Ins. Co.*, No. 04-2339, 2004 WL 2823228, at *3 (E.D. Pa. Dec. 7, 2004) (finding it permissible, after *Lasser*, for Reliance to consider "both the DOT occupation description as well as that of [the insured's employer] to determine the material duties of [the insured's] regular occupation").

 Therefore, even if I were to use April 26, 2002—the first day of the elimination period—as the date of the "onset of disability," I would reach the same conclusion regarding the material duties of Kaelin's regular occupation.  His employment continued to be as an orthopedic surgeon until this date, and he continued to perform as many of the duties of an orthopedic surgeon as he could.

The Third Circuit defined "regular occupation" in *Lasser v. Reliance Standard Life Insurance Co.*, a case also involving Reliance's denial of benefits under an orthopedic surgeon's long-term disability policy. *See* 344 F.3d at 385. In *Lasser*, Reliance argued that a broad, generic definition of an insured's occupation should be used to define "regular occupation." *Id.* The court concluded that "the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' [in the policy's language] make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability." *Id.* at 385-86 (quoting Dr. Lasser's insurance policy). Furthermore, defining an insured's "regular occupation . . . requires 'some consideration of the nature of the institution [at which the claimant] was employed.'" *Id.* at 385 (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*,

---

Kaelin's employer continued to pay him as an orthopedic surgeon. (A.R. 327 (letter from UMC's director of human resources expressing pleasure at working with Kaelin to "maintain[] [his] regular employment status), 350 (indicating that Kaelin was paid a full bonus for the year 2001), 351 (memo dated November 5, 2001, noting that "if Dr. Kaelin recovers fully by the end of March, he could easily cover salary maintenance"), 380 (explaining that, in August 2002 Kaelin's salary was "reduced to $102,000 annually)).

UMC clearly expected him to perform as an orthopedic surgeon, as it kept him on staff after his injury with the expectation that he would again perform surgery. (*See* A.R. 34 (UMC's director of human resource's statement that, "[a]fter his accident and until his taking a disability leave of absence on April 26, 2002, Dr. Kaelin's duties at the Practice did not change: he was expected to perform as a full-time orthopaedic surgeon through such period, notwithstanding his injuries"); 424-27 (Tenet's explanation of Kaelin's occupation on the "Occupation Analysis" portion of Kaelin's insurance claim); 719 (Kaelin's assertion that, after his accident, "Tenet expected [him] to perform all of the duties of an orthopaedic surgeon, notwithstanding [his] injuries from the accident and complications from surgery, in the same manner as [he] did before the accident"); 826 (UMC's letter to Kaelin regarding maintenance of Kaelin's "regular employment status," i.e., his employment as a surgeon)).

None of Tenet's or UMC's statements suggested that Kaelin's employer considered seeing patients in the office to be one of his material duties; to the contrary, seeing patients was considered to be "merely . . . incidental to the performance of surgery." (A.R. 34.) The fact that his employer never considered seeing patients in the office to be a material duty is highly persuasive evidence that seeing patients was not, in fact, one of Kaelin's material duties. Any contrary conclusion is without reason and unsupported by substantial evidence.

11

181 F.3d 243, 253 (2d Cir. 1999)).  The phrasing at issue in Dr. Lasser's policy is almost

identical to that in Kaelin's policy,[5] and Kaelin's policy likewise includes no definition of

"regular occupation"; thus, the Third Circuit's rule is applicable.

In this case, however, the dispute is not whether it is more appropriate to look to the

insured's specific job or to use a generic definition.   The question with respect to Kaelin's

regular occupation is the date of "the onset of disability":  Kaelin argues it is the date of his

injury; Reliance argues it is the date Kaelin stopped working and began his elimination period.

*Lasser* directed courts to the period "immediately before the onset of disability."  But neither the

*Lasser* court nor any other court in this circuit has explicitly defined the date of the "onset of

disability."  The date of the "onset of disability" was not an issue before the *Lasser* court.  For

the following reasons, that date is the date of injury—in this case, June 28, 2001, the date of

Kaelin's jet-ski accident.

Initially, I note that the generic term "disability" is different from the phrase "Total

Disability," which is set forth and specifically defined in the Reliance policy.  Further, there is no

language in the policy which requires the period of "Total Disability" to immediately follow the

_____

[5] Dr. Lasser's policy language is most fully recounted in the district court's decision, *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 623-24 (D.N.J. 2001).  Dr. Lasser's policy provided:

> "Totally Disabled" and "Total Disability" mean, with respect to [Physicians and Administrators], that as a result of an injury or Sickness, during the Elimination Period and thereafter an insured cannot perform the material duties of his/her regular occupation;
>
> (1) "Partially Disabled" and "Partial Disability" mean that as a result of injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period . . . .

*Lasser*, 146 F. Supp. 2d at 623-24.

injury or illness causing the disability.

Moreover, the plain language used by the *Lasser* court supports using the date of injury. The Third Circuit's reference to the onset of disability in *Lasser* is stated in general terms. The court did not define "regular occupation" as the time immediately before the onset of an occasion defined by the policy (e.g., "Total Disability" or "Partial Disability," the terms defined in and referred to in the policy's explanation of benefits). The assumption, then, must be that the Third Circuit intended its rule to be applied in accordance with its plain language. When not used as a term of art, "disability" refers to "a physical or mental illness, injury, or condition that incapacitates in any way." Webster's Third New International Dictionary 642 (1981). "Onset" is defined as the "beginning, commencement, start" or "the initial existence or symptoms of a disease." *Id.* at 1577. Therefore, the relevant time period is that before the initial existence of Kaelin's physical injury; that is, the time period before his accident on June 28, 2001.

Furthermore, the Third Circuit's policy of not penalizing insureds for attempting to return to work after an injury supports using of the date of injury. *See Kaelin*, 405 F. Supp. 2d at 585 (citing *Lasser*, 344 F.3d at 392; *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). After June 28, 2001, Kaelin stopped working for a month, then worked only reduced hours and an intermittent schedule; he twice took time off for surgery and because of his injuries, and he then permanently ceased working in January 2003. *See Kaelin*, 405 F. Supp. 2d at 568. If he had not attempted to return to work after his injury, the date of his injury would clearly be the correct date to use. To hold otherwise now would penalize Kaelin for attempting to return to work to the greatest extent possible and lead to the illogical consequence of denying benefits to an insured who tried to work and granting benefits to one who stopped

13

working at the earliest opportunity.

For the foregoing reasons, the date of the onset of Kaelin's disability is the date of his injury, June 28, 2001, and so his "regular occupation" is determined by looking at the work he performed during the time period immediately before that date. *See also Buonincontri v. Liberty Life Assurance Co. of Boston*, 424 F. Supp. 2d 1302, 1312-13 (M.D. Fla. 2006) (holding, in a suit for long-term disability insurance benefits pursuant to ERISA, that the insured's disability began when she first had to take time off from work because of neck pain, not when her doctor ordered her to stop working after approximately a year of continuing pain); *Nixon v. Life Ins. Co. of N. Am.*, 130 F. Supp. 2d 1279, 1292-94 (M.D. Ala. 2001) (concluding that the insured, who was seeking long-term disability benefits under an ERISA policy, "became disabled when he was 'unable to perform all the material duties of his . . . regular occupation'"; that is, when he had a heart attack and became unable to actually drive a truck, not when his employment was terminated several months later). Immediately prior to June 28, 2001, Kaelin was a full-time orthopedic surgeon employed by UMC who worked seventy to ninety hours per week. (*See* A.R. 593 (estimate of seventy hours per week on another long-term disability policy's claim form); 966 (estimate of ninety hours per week reported to Reliance by a UMC representative).) Therefore, that time period and context must be used to determine what Kaelin's material duties were and a contrary conclusion does not meet the significantly heightened arbitrary and capricious standard of review.

### B.    Kaelin's Material Duties

As noted in the memorandum accompanying the order denying the parties' first summary

judgment motions, the qualifier "material" signifies that not every duty that an employee performs is relevant to the inquiry. *Kaelin*, 405 F. Supp. 2d at 582. "A duty is 'material' when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation.'" *Byrd v. Reliance Standard Life Ins. Co.*, 2004 WL 2823228, at *3 (E.D. Pa. Dec. 7, 2004) (quoting *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 636 (D.N.J. 2001)). Although the Third Circuit has not explicitly adopted this approach, it found the district court's opinion in *Byrd* to be a "thoughtful and well-reasoned analysis." *Byrd v. Reliance Standard Life Ins. Co.*, 160 Fed. Appx. 209, 212 (3d Cir. 2005). Indeed, the Third Circuit used the structure explained in *Byrd*, evaluating the claim on both a qualitative and quantitative basis (albeit without referencing *Byrd*) in *Lasser*. The *Lasser* court found night call and emergency room surgery to be material duties of the orthopedic surgeon-plaintiff because, when Dr. Lasser could no longer perform them, his post-disability earnings "declined by over 50%" from his pre-disability earnings. 344 F.3d at 387. The court also consulted other orthopedic surgeon's answers to survey questions about the materiality of those duties, concluding that they favored "Dr. Lasser's argument that these duties are material even on a generic basis." *Id.* Therefore, I will employ the same quantitative and qualitative analysis.

### 1.    Reliance's Determination on Remand That Seeing Patients in the Office and Casting Were Material Duties

The court "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Pinto*, 214 F.3d at 387. Therefore, I will start with Reliance's conclusion that Kaelin's material duties included seeing patients in his office, and I

will decide whether that conclusion is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya*, 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)).

Reliance found that "the performance of surgery was not the only 'material duty' of [Kaelin's] job as an orthopedic surgeon," and that "'seeing patients' was also a material duty."[6] (A.R. 4.) Reliance drew this conclusion from four factors. First, "a person does not perform orthopedic surgery in a vacuum." Instead, one must first examine a patient, his chart, and his medical history. (A.R. 3.) In support of this argument, Reliance cites statements made on a disability claim form submitted to Unum, another insurance company with which Kaelin had a disability insurance policy. The "employment statement" signed by Tenet's assistant director of human resources, Pam Tomlinson, listed the following as Kaelin's "job duties," which comprised a seventy-hour workweek: "seeing patients in office," "performing orthopaedic surgery," and "hospita[l] duties including ER call." (A.R. 593.) On the "physician questionnaire," Kaelin stated that, in an average seventy-hour workweek, he spent thirty hours at his office. (A.R. 591-92.) Reliance construed this to mean that forty-three percent of Kaelin's time "was spent in the office performing non-surgical duties." (A.R. 3.)

I find it important to note that the Unum claim form asked about Kaelin's "job duties,"

---

[6] Reliance noted that "we do not necessarily suggest that surgery and seeing patients are the only material duties of your job[;] however, we do not need to determine if there exist[] other material duties of your job for purposes of this analysis." (A.R. 4.)

While Reliance specifically concluded only that "seeing patients" in the office was a material duty, it intimated that casting was also a material duty. (*See* A.R. 4.) Reliance reached this conclusion, however, by dismissing the quantitative data provided by Kaelin and by relying solely on its reading that "a major task' is congruous to a 'material duty.'" (A.R. 4.) Much of the following discussion focuses on whether seeing patients is a material duty, but the analysis with respect to casting is essentially the same.

16

and not his "material duties."  I also note that, in the same claim, Kaelin listed only "orthopaedic surgery" when asked to "describe in order of priority the important duties of the specific occupation(s) you were engaged in on a full-time basis at the time disability commenced."  (A.R. 591.)

Furthermore, Kaelin argues that Reliance failed to "conduct[] a full and fair review . . . on remand" with respect to the information about the time Kaelin spent in the office.  (Pl.'s Mem. 12 n.4.)  Kaelin asserts that Reliance's conclusion that he "spent all 30 office hours per week . . . seeing patients" is "a wholly unsupported assumption."  (Pl.'s Mem. 11.)  Kaelin argues that he actually worked ninety to one hundred hours per week:

> the 70 hours per week total and 30 hours per week "at your office" were then unimportant, incorrect estimates (to which [Kaelin] should have paid more attention, but did not due to their irrelevance) for that claim because his personal disability policies' payment of benefits was not conditioned upon his inability to perform a "material duty" of his occupation or a set number of hours per week.

(*Id.* at 12 n.4.)  The ninety-hour week estimate is included in the administrative record.  (*See* A.R. 966.)  In his brief, Kaelin also noted that, if he had been asked, he would have explained that several types of surgical procedures were performed in the office (Pl.'s Mem. 12 n.4), an increasingly common practice in the past twenty years.

Quantitative evidence before me (and before Reliance's decisionmaker) demonstrates that before his accident Kaelin spent little time in the office seeing patients.  The record of Kaelin's office visits in the year before his accident shows that Kaelin spent an average of less than ten hours per week seeing patients.[7]  (A.R. 403.)  Furthermore, billing records submitted to Reliance

_____

[7] David Goodcase, the former practice administrator for Kaelin's group, provided data to Reliance about the number of new patient visits and the number of established patient visits Kaelin had per month from July 2000 through June 2001.  Goodcase explained that Kaelin

show that office visits made up only 4.68% of his billings in the second quarter of 1999, 4.83%

during 2000, and 6.97% during three quarters of 2001.[8]  (A.R. 728.)  These two figures support

each other, and they demonstrate that the estimate of time spent in the office seeing patients used

by Reliance—forty-three percent of a seventy hour week, or thirty hours per week—is not

supported by substantial evidence and is without reason.

     Second, in support of its conclusion that surgery was not Kaelin's only material duty,

Reliance cited Kaelin's letter to Reliance dated June 10, 2002, in which he listed "seeing patients

and performing surgery" as his duties after the date of his accident, noting that these duties were

---

allowed fifteen minutes to see a new patient and five to ten minutes to see an established patient.
Using the data provided, the fifteen minute time for established patients, and an average time of
7.5 minutes per established patient, I find that, on average during the year Kaelin spent only 37.4
hours per month, or roughly nine hours per week, in office visits.

    [8] Reliance dismissed the relevance of data collected from billing records (A.R. 3), which,
according to Kaelin, show that surgeries accounted for at least eighty-one percent of his billings
before the accident and office visits accounted for less than five percent of his billings.  (*See* A.R.
717, 719, 728.)  In its brief, Reliance argues that "[t]he relevant question is what percentage of
his *work* involved surgeries, not the percentage of *billing*."  (Def.'s Mem. 14.)  "Moreover,"
Reliance argues, "the information relied on by plaintiff is not reliable" because "many of the
billing records list[] Dr. Kaelin as the treating surgeon even though the services were provided by
other doctors in the practice group.  Other services were not even billed, such as follow up
emergency room visits."  (*Id.* at 15; *see also* Pl.'s Mem. 8, 15-16 (noting billing irregularities and
citing A.R. 26-32).)

    In his September 14, 2006 letter to Reliance, written under penalty of perjury, Kaelin
noted that when he sold his practice to Tenet, it assumed responsibility for billing and financial
records.  During arbitration proceedings relating to Tenet's billing administration, the records
were found to be incomplete.  (A.R. 715-16.)  The billings are, additionally, not necessarily
accurate for two reasons acknowledged by Kaelin:  First, Tenet's internal billing tracked assigned
surgeries performed by another surgeon to the account of the surgeon who first saw the patient.
(A.R. 716.)  Second, Tenet apparently failed to bill and collect for surgeries performed in 1999
and 2000 and billed for services months after they were rendered.  (A.R. 716.)  Kaelin asserts,
however, that at a minimum these discrepancies cancel each other out and, further, that the
billing records "actually understate[] the percentage of [his] revenues attributable to orthopaedic
surgeries before [his] accident."  (A.R. 717.)

"the same as always." (A.R. 307.)  Kaelin's letter was written in response to a request from

Reliance asking for "in your words what duties you performed at your place of employment when

you returned to work on August 1, 2001 and again on March 4, 2002." (A.R. 309.)  Reliance did

not ask Kaelin to list his "material duties," and Reliance did not indicate to Kaelin that his

answer would be used to establish his "material duties."  Therefore, the letter is not a reliable

indicator of plaintiff's *material* duties.

Third, Reliance cited in its denial a statement that "surgery" and "casting" are "major

tasks requiring use of one or both hands" made by Robert Cox, UMC's then-director of human

resources, on the employer statement portion of Kaelin's Reliance claim form.  (A.R. 424.)

Reliance used this statement to refute Kaelin's argument that his financial billing records show

that casting was not a material duty.  Again, I note that "major tasks" and "material duties" are

not synonymous.  And, using the same data described earlier, Kaelin calculates that, before his

accident, casting accounted for less than three percent of his billings annually.[9]

Fourth, Reliance cited a letter from Dr. Askin, an orthopedic surgeon engaged by

Reliance to review Kaelin's medical records.  Dr. Askin suggested that "[a] physically impaired

orthopedic surgeon is not without some usefulness" because he could perform "office hours, and

administrative activities."  Although this general statement is certainly true, a doctor credentialed

as an orthopedic surgeon who conducts only office hours and administrative duties is obviously

not performing the material duties of the usual work of an orthopedic surgeon; that is, conducting

orthopedic surgery.  (A.R. 892.)  Reliance took this opinion to mean that "at least one orthopedic

---

[9] In the second quarter of 1999, 1.41% of billings were for casting, in 2000, 2.41% of billings were for casting, and in three quarters of 2001, 1.69% of billings were for casting.  (A.R. 721.)

surgeon realizes that there are other important tasks performed by an orthopedic surgeon in the course of his practice."  (A.R. 4.)  Given that plaintiff's material duties must be determined by looking at "the usual work that *the insured* is *actually performing* immediately before the onset of disability," *Lasser*, 344 F.3d at 386 (emphasis added), the relevance of Dr. Askin's statement is questionable.  Indeed, there is no indication that the surgeon who made the statement knew anything about Kaelin's specific practice; the letter was written in response to Reliance's request that he review "the medical information in the claim file."  (A.R. 889.)

Orthopedic surgeons familiar with Kaelin's practice insisted that surgery was his only material duty.  Dr. Neely, an orthopedic surgeon in Kaelin's practice group, wrote

> it is my medical opinion that Dr. Kaelin is no longer able to carry out each and every one of the material duties of an orthopaedic surgeon because of his injuries. . . . The essential function of an orthopaedic surgeon is to conduct orthopaedic surgery.  All other duties are minuscule in comparison to the orthopaedic surgeon's role as a surgeon.

(A.R. 977.)  Similarly, one of Kaelin's treating physicians (an orthopedic surgeon) stated that because Kaelin cannot perform surgery, he is no longer capable of being a surgeon.  (A.R. 896.)  Furthermore, UMC's director of human resources explained to Reliance that surgery was Kaelin's only material duty.  Cox stated in a sworn affidavit that, had he been asked to list the material duties of Kaelin's job as an orthopedic surgeon, he would have responded:

> the performance of orthopaedic surgeries was Dr. Kaelin's essential function as an orthopedic surgeon, and *all* other duties he had as an orthopaedic surgeon were dependent upon his ability to perform surgery.  Without the ability to perform surgery, Dr. Kaelin would not have been employed by UMC or Tenet in that capacity.

(A.R. 34.)  Finally, Kaelin himself, in a letter to Reliance dated September 14, 2006 written under penalty of perjury for the purpose of providing additional information to Reliance for its

consideration on remand, explained the difference between an "orthopaedic surgeon" and an

"orthopedist."  He asserted that "an inability to perform [surgery] means that one is no longer

practicing the regular occupation of an orthopaedic surgeon.  Rather, he or she is an

orthopaedist."[10]  (A.R. 718.)  None of these explanations are cited in Reliance's denial.

Reliance concluded, following *Lasser* and looking at the "actual duties performed by the

plaintiff," that seeing patients was a "material duty" of Kaelin's job, "or at least a material duty

of [Kaelin's] job as it existed from June 2001 through April 26, 2002."  The implicit suggestion

in that statement is that seeing patients in the office was not a material duty of Kaelin's regular

occupation prior to June 28, 2001, the relevant time period.

Employing the "significantly heightened arbitrary and capricious standard of review,"

*Kaelin*, 405 F. Supp. 2d at 580, I find Reliance's determination that seeing patients in the office

and casting are "material duties" to be unsupported by substantial evidence and without reason.

Reliance seems to have summarily dismissed Kaelin's quantitative data—billing records for the

practice and records of office visits during the year before Kaelin's accident.  Similarly, Reliance

---

[10] In making this distinction, Kaelin is presumably relying on the *Lasser* court's
distinction between "orthopedics" and "orthopedic surgery" (although Kaelin does not, in his
letter to Reliance, cite *Lasser*).  The Third Circuit noted:

> Reliance must have concluded that [Dr. Lasser's] "occupational field" is orthopedics
> rather than orthopedic surgery—*i.e.*, that his "regular occupation" is one in which it
> is reasonable to conduct an office practice only or write reports, which some of the
> [responses to a labor market] survey [of orthopedic surgeons commissioned by
> Reliance to determine whether performing emergency surgery and being on-call are
> material duties of an orthopedic surgeon] suggested as available options.

344 F.3d at 387 n.5.  Kaelin supported the distinction he drew by explaining the differential in
insurance premiums paid by orthopedists and orthopedic surgeons.  (*See* A.R. 718 & n.1, 823-
24.)  *But see Dorland's Illustrated Medical Dictionary* 1326 (30th ed. 2003) (defining
"orthopedics" as "that branch of *surgery* which is specially concerned with the preservation and
restoration of the function of the skeletal system, its articulations, and associated structures" and
"orthopedist" as "an orthopedic *surgeon*" (emphasis added)).

appears to have ignored the qualitative data Kaelin and UMC produced.

I also find Reliance's methodology to be unreasonable.  As noted above, Reliance construed the terms "job duties" and "major tasks" to be equivalent to the Reliance policy's term "material duties."  Reliance intimated that other insurance companies' determinations were irrelevant to the analysis, but then used information reported to other insurers against Kaelin. (*See* A.R. 922 (Kaelin's letter apprising Reliance of Unum's decision that Kaelin was disabled because he could not perform the "substantial and material duties" of his occupation); 890 (Reliance's denial letter advising Kaelin that "while we consider the determinations of other insurance policies, they are not binding on our decision as to whether Dr. Kaelin meets the definition of 'Total Disability' as set forth in the [Reliance policy]" because the criteria used and the evidence reviewed by the companies are not necessarily the same).)  Therefore, I find that Reliance acted arbitrarily and capriciously in determining that office visits and casting were material duties of Kaelin's regular occupation before the onset of his disability.  Accordingly, I will not grant Reliance's cross-motion for summary judgment on this point.

### 2.      Remedy

Once a court has found an administrator's actions to be arbitrary and capricious, the court may either remand the case to the administrator or it can award benefits under the insurance policy.  *See Kaelin*, 2006 WL 2382005, at *3 (citing *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003)).  The court has "considerable discretion" in choosing which remedy to award.  *Id.*

Remand was the appropriate remedy for Reliance's arbitrary and capricious original final

denial of benefits on February 3, 2003, which was at issue in the parties' first summary judgment motions, because "Reliance erred . . . by applying the wrong standard: it based its consideration of Kaelin's eligibility on the wrong elimination period." *Id.* at *5. Furthermore, "the record as [then] developed [wa]s ambiguous about [Kaelin's] entitlement to benefits" and "the record [wa]s insufficiently developed for the court to resolve the ambiguity." *Id.*

Those concerns no longer apply, as the record is fully developed at this point. "[A] remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (internal quotation marks omitted). Indeed, "a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001). Therefore, I will reverse Reliance's decision and hold that Kaelin is entitled to long-term disability benefits under the Reliance policy.

I conclude that seeing patients in the office was not one of Kaelin's material duties prior to June 28, 2001. Reliance relies largely on statements of Kaelin's "duties" and "important tasks." These statements were not made in response to questions about "material duties," and they were certainly not made in contemplation of use by Reliance in evaluating Kaelin's claim for long-term disability insurance. Statements made by Kaelin himself and by those familiar with his practice are supported by the quantitative evidence provided by Kaelin and UMC. The two types of quantitative evidence before Reliance—the billing records and the time records—in turn support each other.

Finally, common sense suggests that one cannot engage in the regular occupation of an

orthopedic *surgeon* without performing surgery.  As I agree with the definition of "material" used in *Byrd* (and implicitly sanctioned by the Third Circuit), I find that seeing patients in the office and casting were not Kaelin's material duties.  Unlike the performance of surgery, neither of these tasks is "sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation,'" 2004 WL 2823228, at *3.

### IV.   Conclusion

Kaelin is entitled to long-term disability benefits under the Reliance policy because he was unable to perform each and every material duty of his regular occupation during the policy's ninety-day elimination period that ran from April 27, 2002 through July 25, 2002, inclusive.  His "regular occupation"—the usual work that the insured is actually performing immediately before the onset of disability, i.e., immediately before his accident on June 28, 2001—was being an orthopedic surgeon.  As an orthopedic surgeon, Kaelin's sole "material duty" was performing orthopedic surgery.  As previously decided, Kaelin was unable to perform such surgery during the elimination period.  *See* 405 F. Supp. 2d at 584.  Therefore, he was "totally disabled" under the Reliance policy and entitled to benefits beginning on July 26, 2002.[11]

I will thus grant Kaelin's second motion for summary judgment, and I will deny Reliance's cross-motion for summary judgment.  An appropriate order follows.

---

[11] Reliance does not, and cannot, dispute that Kaelin's disability began with his accident on June 28, 2001.  Nor is there any dispute that Kaelin was "Totally Disabled" from practicing as an orthopedic surgeon (as opposed to as an orthopedist) during the elimination period as a result of the accident.  Reliance's efforts to penalize Kaelin for his attempts to return to work on a partial basis and to the maximum extent his physical health permitted should not be condoned.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHARLES R. KAELIN, M.D., | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | CIVIL ACTION |
|  | : | |
| TENET EMPLOYEE BENEFIT PLAN, | : | NO. 04-2871 |
| BENEFITS ADMINISTRATION COMMITTEE | : | |
| OF THE TENET EMPLOYEE BENEFIT PLAN, | : | |
| RELIANCE STANDARD LIFE INSURANCE | : | |
| COMPANY, and TENET HEALTHCARE | : | |
| CORPORATION, | : | |
| Defendants. | : | |

## Order

AND NOW, this _____ day of November 2007, upon consideration of plaintiff Charles

B. Kaelin's second motion for summary judgment (Docket No. 72), defendant Reliance Standard

Life Insurance Company's cross-motion for summary judgment (Docket No. 75), and the

responses and replies thereto, IT IS HEREBY ORDERED that plaintiff's motion is GRANTED

and defendant's motion is DENIED.  Judgment is entered in favor of plaintiff and against

defendant with reference to Count I of the First Amended Complaint.  Plaintiff is entitled to

long-term disability benefits under Reliance Standard Life Insurance Company policy number

LSC 103763, together with prejudgment interest and costs.

IT IS FURTHER ORDERED that a status conference to consider the scheduling of any

remaining issues in the action is fixed for December 19, 2007, at 9:30 a.m. in Chambers.


_____
s/ William H. Yohn Jr.
William H. Yohn Jr., Judge